# COLGROVE *v.* BATTIN, U. S. DISTRICT JUDGE

No. 71–1442. Argued January 17, 1973—Decided June 21, 1973

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which POWELL, J., joined, *post*, p. 165. MARSHALL, J., filed a dissenting opinion, in which STEWART, J., joined, *post*, p. 166. POWELL, J., filed a dissenting opinion, *post*, p. 188.

*Lloyd J. Skedd* argued the cause and filed a brief for petitioner.

*Cale Crowley* argued the cause and filed a brief for respondent.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Local Rule 13(d)(1) of the Revised Rules of Procedure of the United States District Court for the District of

---

*Briefs of *amici curiae* were filed by *William A. Wick, Alston Jennings,* and *John C. Elam* for the International Association of Insurance Counsel; by *Joseph W. Cotchett, David Daar, Leonard Sacks, Siegfried Hesse, Edward I. Pollock, Theodore A. Horn,* and *Marvin E. Lewis* for the California Trial Lawyers Assn.; by *Leonard Boudin* and *Alan Scheflin* for the National Emergency Civil Liberties Committee; and by the Nooter Corp.

Montana provides that a jury for the trial of civil cases shall consist of six persons.[1] When respondent District Court Judge set this diversity case for trial before a jury of six in compliance with the Rule, petitioner sought mandamus from the Court of Appeals for the Ninth Circuit to direct respondent to impanel a 12-member jury. Petitioner contended that the local Rule (1) violated the Seventh Amendment;[2] (2) violated the statutory provision, 28 U. S. C. § 2072, that rules "shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment . . .";[3]

---

[1] Rule 13 (d) (1) provides:

"A jury for the trial of civil cases shall consist of six persons plus such alternate jurors as may be impaneled."

Similar local rules have been adopted by 54 other federal district courts, at least as to some civil cases. See the appendix to Fisher, The Seventh Amendment and the Common Law: No Magic in Numbers, 56 F. R. D. 507, 535–542 (1973) (the District Court of Delaware has since adopted a rule effective January 1, 1973). In addition, two bills were introduced in the 92d Congress to reduce to six the number of jurors in all federal civil cases. H. R. 7800, 92d Cong., 1st Sess. (1971); H. R. 13496, 92d Cong., 2d Sess. (1972). H. R. 7800, insofar as it related to civil juries, has received the approval of the Committee on the Operation of the Jury System of the Judicial Conference of the United States. 1971 Annual Report of the Director of the Administrative Office of the United States Courts 41. That Conference itself at its March 1971 meeting endorsed "in principle" a reduction in the size of civil juries. *Ibid.*

[2] The Seventh Amendment provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

State court decisions have usually turned on the interpretation of state constitutional provisions. See Ann., 47 A. L. R. 3d 895 (1973).

[3] Title 28 U. S. C. § 2072 provides:

"The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the

and (3) was rendered invalid by Fed. Rule Civ. Proc. 83 because "inconsistent with" Fed. Rule Civ. Proc. 48 that provides for juries of less than 12 when stipulated by the parties.[4]  The Court of Appeals found no merit in these contentions, sustained the validity of local Rule 13 (d) (1), and denied the writ, 456 F. 2d 1379 (1972).  We granted certiorari, 409 U. S. 841 (1972).  We affirm.

## I

In *Williams* v. *Florida*, 399 U. S. 78 (1970), the Court sustained the constitutionality of a Florida statute providing for six-member juries in certain criminal cases. The constitutional challenge rejected in that case relied on the guarantees of jury trial secured the accused by Art. III, § 2, cl. 3, of the Constitution and by the Sixth Amendment.[5]  We expressly reserved, however, the ques-

---

practice and procedure of the district courts and courts of appeals of the United States in civil actions . . . .

"Such rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution."

[4] Fed. Rule Civ. Proc. 48 provides:

"The parties may stipulate that the jury shall consist of any number less than twelve or that a verdict or a finding of a stated majority of the jurors shall be taken as the verdict or finding of the jury."

Fed. Rule Civ. Proc. 83 provides:

"Each district court by action of a majority of the judges thereof may from time to time make and amend rules governing its practice not inconsistent with these rules. . . . In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules."

[5] Art. III, § 2, cl. 3, provides:

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to

tion whether "additional references to the 'common law' that occur in the Seventh Amendment might support a different interpretation" with respect to jury trial in civil cases. *Id.,* at 92 n. 30. We conclude that they do not.

The pertinent words of the Seventh Amendment are: "In Suits at common law . . . the right of trial by jury shall be preserved . . . ." [6] On its face, this language is not directed to jury characteristics, such as size, but rather defines the kind of cases for which jury trial is preserved, namely, "suits at common law." And while it is true that "[w]e have almost no direct evidence concerning the intention of the framers of the seventh amendment itself," [7] the historical setting in which the Seventh Amendment was adopted highlighted a controversy that was generated, not by concern for preservation of jury characteristics at common law, but by fear that the civil jury itself would be abolished unless protected in express words. Almost a century and a half ago, this Court recognized that "[o]ne of the strongest

a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

[6] The reference to "common law" contained in the second clause of the Seventh Amendment is irrelevant to our present inquiry because it deals exclusively with the prohibition contained in that clause against the indirect impairment of the right of trial by jury through judicial re-examination of factfindings of a jury other than as permitted in 1791. *Baltimore & Carolina Line, Inc. v. Redman,* 295 U. S. 654, 657 (1935); *Parsons v. Bedford,* 3 Pet. 433, 447–448 (1830); 5 J. Moore, Federal Practice ¶ 38.08 [5], pp. 86–90 (2d ed. 1971).

[7] Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289, 291 (1966).

objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases." *Parsons v. Bedford,* 3 Pet. 433, 445 (1830). But the omission of a protective clause from the Constitution was not because an effort was not made to include one. On the contrary, a proposal was made to include a provision in the Constitution to guarantee the right of trial by jury in civil cases but the proposal failed because the States varied widely as to the cases in which civil jury trial was provided, and the proponents of a civil jury guarantee found too difficult the task of fashioning words appropriate to cover the different state practices.[8]  The

---

[8] See 2 M. Farrand, Records of the Federal Convention 587 (1911). See also Henderson, *supra,* n. 7, at 292–294.

The question of a provision for the protection of the right to trial by jury in civil cases apparently was not presented at the Constitutional Convention until a proposed final draft of the Constitution was reported out of the Committee on Style and Arrangement. At that point, Mr. Williamson of North Carolina "observed to the House that no provision was yet made for juries in Civil cases and suggested the necessity of it." 2 Farrand, *supra,* at 587. This provoked the following discussion:

"Mr. Gorham. It is not possible to discriminate equity cases from those in which juries are proper. The Representatives of the people may be safely trusted in this matter.

"Mr. Gerry urged the necessity of Juries to guard [against] corrupt Judges. He proposed that the Committee last appointed should be directed to provide a clause for securing the trial by Juries.

"Col. Mason perceived the difficulty mentioned by Mr. Gorham. The jury cases cannot be specified. A general principle laid down on this and some other points would be sufficient. He wished the plan had been prefaced with a Bill of Rights, & would second a Motion if made for the purpose . . . ." *Ibid.*

Three days later, a proposal was made by Mr. Gerry and Mr. Pinckney to add the following language to the Art. III guarantee of trial by jury in criminal cases: "And a trial by jury shall be pre-

strong pressures for a civil jury provision in the Bill of Rights encountered the same difficulty. Thus, it was agreed that, with no federal practice to draw on and

served as usual in civil cases." This proposal prompted the following reaction:

"Mr. Gorham. The constitution of Juries is different in different States and the trial itself is *usual* in different cases in different States.

"Mr. King urged the same objections.

"Genl. Pinckney also. He thought such a clause in the Constitution would be pregnant with embarrassments.

"The motion was disagreed to nem. con." *Id.*, at 628.

James Wilson of Pennsylvania defended the omission at the Pennsylvania Convention convened to ratify the Constitution:

"The cases open to a jury, differed in the different states; it was therefore impracticable, on that ground, to have made a general rule. The want of uniformity would have rendered any reference to the practice of the states idle and useless: and it could not, with any propriety, be said, that 'the trial by jury shall be as heretofore:' since there has never existed any foederal system of jurisprudence, to which the declaration could relate. Besides, it is not in all cases that the trial by jury is adopted in civil questions: for causes depending in courts of admiralty, such as relate to maritime captures, and such as are agitated in the courts of equity, do not require the intervention of that tribunal. How, then, was the line of discrimination to be drawn? The convention found the task too difficult for them; and they left the business as it stands—in the fullest confidence, that no danger would possibly ensue, since the proceedings of the supreme court are to be regulated by the congress, which is a faithful representation of the people: and the oppression of government is effectually barred, by declaring that in all criminal cases, the trial by jury shall be preserved." 3 M. Farrand, Records of the Federal Convention 101 (1911).

A proponent of a guarantee responded:

"The second and most important objection to the federal plan, which Mr. Wilson pretends to be made in a disingenuous form, is the entire abolition of the trial by jury in civil cases. It seems to me that Mr. Wilson's pretended answer is much more disingenuous than the objection itself . . . . He says, 'that the cases open to trial by jury differing in the different States, it was therefore impracticable to have made a general rule.' This answer is extremely futile, because a reference might easily have been made to the com-

since state practices varied so widely, any compromising language would necessarily have to be general. As a result, although the Seventh Amendment achieved the primary goal of jury trial adherents to incorporate an explicit constitutional protection of the right of trial by jury in civil cases, the right was limited in general words to "suits at common law." [9] We can only conclude, therefore, that by referring to the "common law," the Framers of the Seventh Amendment were concerned with preserving the *right* of trial by jury in civil cases where it existed at common law, rather than the various inci-

---

mon law of England, which obtains through every State, and cases in the maritime and civil law courts would, of course, be excepted. . . ." Quoted in Henderson, *supra*, n. 7, at 296–297. See also 1 J. Elliot, The Debates in the Several State Conventions, on the Adoption of the Federal Constitution (2d ed. 1836).

[9] That the words "common law" were used merely to establish a general rule of trial by jury in civil cases was the view of Mr. Justice Story in the discussion in his Commentaries of the Seventh Amendment and the Judiciary Act of 1789:

"The phrase, 'common law,' found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence. The constitution had declared, in the third article, 'that the judicial power shall extend to all cases in *law and equity* arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority,' &c., and 'to all cases of *admiralty and maritime jurisdiction*.' It is well known, that in civil causes, in courts of equity and admiralty, juries do not intervene; and that courts of equity use the trial by jury only in extraordinary cases to inform the conscience of the court. When, therefore, we find, that the amendment requires, that the right of trial by jury shall be preserved in suits at common law, the natural conclusion is, that the distinction was present to the minds of the framers of the amendment. By *common law* they meant, what the constitution denominated in the third article 'law' . . . . And congress seem to have acted with reference to this exposition in the judiciary act of 1789, ch. 20, (which was contemporaneous with the proposal of this amendment;) . . . ." 3 J. Story, Commentaries on the Constitution of the United States 645–646 (1833).

dents of trial by jury.[10]  In short, what was said in *Williams* with respect to the criminal jury is equally applicable here: constitutional history reveals no intention on the part of the Framers "to equate the constitutional and common-law characteristics of the jury." 399 U. S., at 99.

Consistently with the historical objective of the Seventh Amendment, our decisions have defined the jury right preserved in cases covered by the Amendment, as "the substance of the common-law right of trial by jury, as distinguished from mere matters of form or procedure . . . ." *Baltimore & Carolina Line, Inc.* v. *Redman,* 295 U. S. 654, 657 (1935).[11]  The Amendment, therefore, does not "bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791," *Galloway* v. *United States,* 319

---

[10] Constitutional history does not reveal a single instance where concern was expressed for preservation of the traditional number 12.  Indeed, James Wilson of Pennsylvania, a member of the Constitutional Convention and later a Justice of this Court, stated: "When I speak of juries, I feel no peculiar predilection for the number twelve . . . ."  2 The Works of James Wilson 503 (R. McCloskey ed. 1967).

[11] See also Scott, Trial by Jury and the Reform of Civil Procedure, 31 Harv. L. Rev. 669, 671 (1918):

"Although the incidents of trial by jury which existed at the time of the adoption of the constitutional guaranty are not thereby abolished, yet those incidents are not necessarily made unalterable.  Only those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed beyond the reach of the legislature.  The question of the constitutionality of any particular modification of the law as to trial by jury resolves itself into a question of what requirements are fundamental and what are unessential, a question which is necessarily, in the last analysis, one of degree.  The question, it is submitted, should be approached in a spirit of open-mindedness, of readiness to accept any changes which do not impair the fundamentals of trial by jury.  It is a question of substance, not of form."

U. S. 372, 390 (1943); see also *Ex parte Peterson*, 253 U. S. 300, 309 (1920); *Walker* v. *New Mexico & S. P. R. Co.*, 165 U. S. 593, 596 (1897), and "[n]ew devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. . . ." *Ex parte Peterson, supra,* at 309–310; *Funk* v. *United States,* 290 U. S. 371, 382 (1933).

Our inquiry turns, then, to whether a jury of 12 is of the substance of the common-law right of trial by jury. Keeping in mind the purpose of the jury trial in criminal cases to prevent government oppression, *Williams,* 399 U. S., at 100, and, in criminal and civil cases, to assure a fair and equitable resolution of factual issues, *Gasoline Products Co.* v. *Champlin Co.,* 283 U. S. 494, 498 (1931), the question comes down to whether jury performance is a function of jury size. In *Williams,* we rejected the no-. tion that "the reliability of the jury as a factfinder . . . [is] a function of its size," 399 U. S., at 100–101, and nothing has been suggested to lead us to alter that conclusion. Accordingly, we think it cannot be said that 12 members is a substantive aspect of the right of trial by jury.

It is true, of course, that several earlier decisions of this Court have made the statement that "trial by jury" means "a trial by a jury of twelve . . . ." *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 13 (1899); see also *American Publishing Co.* v. *Fisher,* 166 U. S. 464 (1897); *Maxwell* v. *Dow,* 176 U. S. 581, 586 (1900). But in each case, the reference to "a jury of twelve" was clearly dictum and not a decision upon a question presented or litigated. Thus, in *Capital Traction Co.* v. *Hof, supra,* the case most often cited, the question presented was whether a civil action brought before a justice of the peace of the District of Columbia was triable by jury,

and that question turned on whether the justice of the peace was a judge empowered to instruct them on the law and advise them on the facts. Insofar as the *Hof* statement implied that the Seventh Amendment required a jury of 12, it was at best an assumption. And even if that assumption had support in common-law doctrine,[12] our canvass of the relevant constitutional history, like the history canvassed in *Williams* concerning the criminal jury, "casts considerable doubt on the easy assumption in our past decisions that if a given feature existed in a jury at common law . . . then it was necessarily preserved in the Constitution." 399 U. S., at 92–93. We cannot, therefore, accord the unsupported dicta of these earlier decisions the authority of decided precedents.[13]

There remains, however, the question whether a jury of six satisfies the Seventh Amendment guarantee of "trial by jury." We had no difficulty reaching the conclusion in *Williams* that a jury of six would guarantee an accused the trial by jury secured by Art. III and the Sixth Amendment. Significantly, our determination that there was "no discernible difference between the results reached by the two different-sized juries," 399 U. S., at 101, drew largely upon the results of studies of the operations of juries of six in civil cases.[14] Since then,

---

[12] Although *Williams* proceeded on the premise that the common-law jury was composed of 12 members, juries of less than 12 were common in this country throughout colonial times. See the cases and statutes cited in Fisher, *supra,* n. 1, at 529–532.

[13] See Devitt, The Six Man Jury in the Federal Court, 53 F. R. D. 273, 274 (1971); Augelli, Six-Member Juries in Civil Actions in the Federal Judicial System, 3 Seton Hall L. Rev. 281, 285 (1972); Croake, Memorandum on the Advisability and Constitutionality of Six Man Juries and 5/6 Verdicts in Civil Cases, 44 N. Y. State B. J. 385 (1972). See also *Leger* v. *Westinghouse Electric Corp.,* 54 F. R. D. 574 (WD La. 1972); contra, *Winsby* v. *John Oster Mfg. Co.,* 336 F. Supp. 663 (WD Pa. 1972).

[14] *Williams* v. *Florida,* 399 U. S. 78, 101 n. 48 (1970).

much has been written about the six-member jury, but nothing that persuades us to depart from the conclusion reached in *Williams*.[15]   Thus, while we express no view

[15] Arguments, pro and con, on the effectiveness of a jury of six compared to a jury of 12 will be found in Devitt, *supra*, n. 13; Augelli, *supra*, n. 13; Croake, *supra*, n. 13; Fisher, *supra*, n. 1; Bogue & Fritz, The Six-Man Jury, 17 S. D. L. Rev. 285 (1972); Moss, The Twelve Member Jury in Massachusetts—Can it be Reduced?, 56 Mass. L. Q. 65 (1971); Zeisel, . . . And Then There Were None: The Diminution of the Federal Jury, 38 U. Chi. L. Rev. 710 (1971); Zeisel, The Waning of the American Jury, 58 A. B. A. J. 367 (1972); Gibbons, The New Minijuries: Panacea or Pandora's Box?, 58 A. B. A. J. 594 (1972); Kaufman, The Harbingers of Jury Reform, 58 A. B. A. J. 695 (1972); Whalen, Remarks on Resolution of 7th Amendment Jury Trial Requirement, 54 F. R. D. 148 (1972); Note, Right to Twelve-Man Jury, 84 Harv. L. Rev. 165 (1970); Note, Reducing the Size of Juries, 5 U. Mich. J. L. Reform 87 (1971); Note, The Effect of Jury Size on the Probability of Conviction: An Evaluation of *Williams* v. *Florida*, 22 Case W. Res. L. Rev. 529 (1971); Comment, Defendant's Right to a Jury Trial—Is Six Enough?, 59 Ky. L. J. 997 (1971).

Professor Zeisel has suggested that the six-member jury is more limited than the 12-member jury in representing the full spectrum of the community, and this in turn may result in differences between the verdicts reached by the two panels. Zeisel, *supra*, 38 U. Chi. L. Rev., at 716–719.

On the other hand, one study suggests that the decrease in the size of the jury from 12 to six is conducive to a more open discussion among the jurors, thereby improving the quality of the deliberative process. Note, *supra*, 5 U. Mich. J. L. Reform, at 99–106. See also C. Joiner, Civil Justice and the Jury 31, 83 (1962) (concluding prior to *Williams* that the deliberative process should be the same in either six- or 12-member juries).

In addition, four very recent studies have provided convincing empirical evidence of the correctness of the *Williams* conclusion that "there is no discernible difference between the results reached by the two different-sized juries." Note, Six-Member and Twelve-Member Juries: An Empirical Study of Trial Results, 6 U. Mich. J. L. Reform 671 (1973); Institute of Judicial Administration, A Comparison of Six- and Twelve-Member Civil Juries in New Jersey Superior and County Courts (1972); Note, An Empirical Study of

as to whether any number less than six would suffice,[16] we conclude that a jury of six satisfies the Seventh Amendment's guarantee of trial by jury in civil cases.[17]

Six- and Twelve-Member Jury Decision-Making Processes, 6 U. Mich. J. L. Reform 712 (1973); Bermant & Coppock, Outcomes of Six- and Twelve-Member Jury Trials: An Analysis of 128 Civil Cases in the State of Washington, 48 Wash. L. Rev. 593 (1973).

[16] What is required for a "jury" is a number large enough to facilitate group deliberation combined with a likelihood of obtaining a representative cross section of the community. *Williams* v. *Florida,* 399 U. S., at 100. It is undoubtedly true that at some point the number becomes too small to accomplish these goals, but, on the basis of presently available data, that cannot be concluded as to the number six. See Tamm, A Proposal for Five-Member Civil Juries in the Federal Courts, 50 A. B. A. J. 162 (1964); Tamm, The Five-Man Civil Jury: A Proposed Constitutional Amendment, 51 Geo. L. J. 120 (1962).

[17] My Brother MARSHALL argues in dissent that the various incidents of trial by jury as they existed at common law are immutably saved by the Seventh Amendment's use of the word "preserved." But obviously the Amendment commands only that the *right* of trial by jury be "preserved." Since a jury of 12 is, as has been shown, not of the substance of the common-law right of trial by jury and since there is "no discernible difference between the results reached by the two different-sized juries," *Williams* v. *Florida, supra,* at 101, the use of a six-member civil jury does not impair the *right* "preserved" by the Seventh Amendment. Indeed, as my Brother MARSHALL himself recognizes, *post,* at 179, several devices designed to improve the jury system and unknown to the common law have been approved by this Court over the years. See also Henderson, *supra,* n. 7; Scott, *supra,* n. 11. In each case, the determining factor was that the new device did not impair the *right* preserved by the Seventh Amendment. As Mr. Justice Brandeis aptly stated in response to the argument that a federal court was prevented by the Seventh Amendment from utilizing a special master because it would infringe upon the right of trial by jury:

"The command of the Seventh Amendment that 'the right of trial by jury shall be preserved' . . . does not prohibit the introduction of new methods for determining what facts are actually in issue, nor does it prohibit the introduction of new rules of evidence. Changes

## II

The statute, 28 U. S. C. § 2072, authorizes this Court to promulgate the Federal Rules of Civil Procedure but provides that "[s]uch rules . . . shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution." [18]  Petitioner argues that in securing trial by jury "as at common law" and also "as declared by the Seventh Amendment," Congress meant to provide a jury having the characteristics of the common-law jury even if the Seventh Amendment did not require a jury with those characteristics.  As the Court of Appeals observed, "[t]his would indeed be a sweeping limitation."  456 F. 2d, at 1380. Petitioner would impute to Congress an intention to saddle archaic and presently unworkable common-law procedures upon the federal courts [19] and thereby to nullify innovative changes approved by this Court over the years that have now become commonplace and, for

---

in these may be made. New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right. The limitation imposed by the Amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with." *Ex parte Peterson,* 253 U. S. 300, 309–310 (1920).

[18] Section 2072 is in terms applicable only to the general Federal Rules of Civil Procedure prescribed by this Court. However, 28 U. S. C. § 2071, which authorizes federal district courts to prescribe local rules of practice and procedure, see Part III, *infra,* requires such rules to be "consistent with Acts of Congress" as well as the general Federal Rules. Thus, if § 2072 prohibits a jury of less than 12, the local rule in question would conflict with an Act of Congress and would therefore be invalid. See 3A W. Barron & A. Holtzoff, Federal Practice and Procedure § 1171, p. 179 (C. Wright ed. 1958).

[19] See Henderson, *supra,* n. 7; Scott, *supra,* n. 11.

all practical purposes, "essential to the preservation of the right" of trial by jury in our modern society. *Ex parte Peterson,* 253 U. S., at 310; *Galloway* v. *United States,* 319 U. S., at 390–391. For to say that Congress chose this means to render our system of civil jury trial immutable as of 1791, or some other date, is to say the Congress meant to deny the judiciary the "flexibility and capacity for growth and adaptation [which] is the peculiar boast and excellence of the common law." *Hurtado* v. *California,* 110 U. S. 516, 530 (1884); *Funk* v. *United States,* 290 U. S., at 382.

But petitioner's extravagant contention has not the slightest support in the legislative history of the provision. Section 2072 is derived from the Enabling Act of 1934, 48 Stat. 1064.[20] Section 2 of that Act gave this Court the "power to unite the general rules prescribed . . . for cases in equity with those in actions at law so as to secure one form of civil action and procedure for both." H. R. Rep. No. 1829, 73d Cong., 2d Sess., 1 (1934). As emphasized by the Court of Appeals, the language of § 2 preserving the right of trial by jury was included "to assure that with such union [of law and equity] the right of trial by jury would be neither expanded nor contracted." 456 F. 2d, at 1381, citing 5 J. Moore, Federal Practice ¶ 38.06, p. 44 (2d ed. 1971). See also *Cooley* v. *Strickland Transportation Co.,* 459 F. 2d 779, 785 (CA5 1972). In other words, Congress used the language in question for the sole purpose of creating a statutory right coextensive with that under the Seventh

---

[20] See 5 J. Moore, Federal Practice ¶ 38.06 (2d ed. 1971). The pertinent provisions of the Enabling Act of 1934 were carried forward by the codifying act of 1948, 62 Stat. 961, and later became § 2072 of the Judicial Code, 28 U. S. C. § 1 *et seq.* Section 2072 has been amended several times since 1947, but none of the amendments is relevant to our present discussion.

Amendment itself.[21]    If Congress had meant to prescribe
a jury number or to legislate common-law features gen-
erally, "it knew how to use express language to that
effect."  *Williams* v. *Florida,* 399 U. S., at 97.

## III

Petitioner's argument that local Rule 13 (d)(1) [22] is
inconsistent with Fed. Rule Civ. Proc. 48 rests on the
proposition that Rule 48 implies a direction to impanel a
jury of 12 in the absence of a stipulation of the parties for
a lesser number.    Rule 48 was drafted at the time the
statement in *Capital Traction Co.* v. *Hof, supra,* that
trial by jury means a "jury of twelve," was generally
accepted.    Plainly the assumption of the draftsmen that
such was the case cannot be transmuted into an implied
direction to impanel juries of 12 without regard to
whether a jury of 12 was required by the Seventh Amend-
ment.    Our conclusion that the *Hof* statement lacks prec-
edential weight leaves Rule 48 without the support even
of the draftsmen's assumption and thus there is nothing
in the Rule with which the local Rule is inconsistent.[23]

---

[21] Cf. *Sibbach* v. *Wilson & Co.,* 312 U. S. 1, 10 (1941): "The
second [proviso of the Enabling Act of 1934] is that if the rules are
to prescribe a single form of action for cases at law and suits in
equity, the constitutional right to jury trial inherent in the former
must be preserved."

[22] This Rule was adopted pursuant to Fed. Rule Civ. Proc. 83,
which in turn is derived from 28 U. S. C. § 2071:

"The Supreme Court and all courts established by Act of Congress
may from time to time prescribe rules for the conduct of their busi-
ness.  Such rules shall be consistent with Acts of Congress and rules
of practice and procedure prescribed by the Supreme Court."

[23] An *amicus* argues that the local Rule is invalid under our
decision in *Miner* v. *Atlass,* 363 U. S. 641 (1960).  That argument
is misplaced.  *Miner* struck down a local rule authorizing discovery-
deposition practice in admiralty cases.  A court of admiralty had

See *Cooley* v. *Strickland Transportation Co.*, *supra*, at 783–785; Devitt, The Six Man Jury in the Federal Court, 53 F. R. D. 273, 274 n. 1 (1971).

Similarly, we reject the argument that the local Rule conflicts with Rule 48 because it deprives petitioner of the right to stipulate to a jury of "any number less than twelve." Aside from the fact that there is no indication in the record that petitioner ever sought a jury of less than 12, Rule 48 "deals only with a stipulation *by* '[*t*]*he parties.*' It does not purport to prevent *court rules* which provide for civil juries of reduced size." *Cooley* v. *Strickland Transportation Co.*, *supra*, at 784.

*Affirmed.*

---

no inherent power, independent of statute or rule, to order the taking of depositions for the purpose of discovery. In 1939, this Court omitted this "basic procedural innovation" from among the Civil Rules adopted as part of the Admiralty Rules. *Miner* held that this omission "must be taken as an advertent declination of the opportunity to institute the discovery-deposition procedure of Civil Rule 26 (a) throughout courts of admiralty," *id.*, at 648, and therefore, for this and additional reasons stated in the opinion, that the local rule "is not consistent with the present General Admiralty Rules . . . ." *Id.*, at 647. In contrast, we hold in this case that Local Rule 13 (d) (1) is not inconsistent with Fed. Rule Civ. Proc. 48.

*Amicus* also suggests that *Miner* should be read to hold that all "basic procedural innovations" are beyond local rulemaking power and are exclusively matters for general rulemaking. We need not consider the suggestion because, in any event, we conclude that the requirement of a six-member jury is not a "basic procedural innovation." The "basic procedural innovations" to which *Miner* referred are those aspects of the litigatory process which bear upon the ultimate outcome of the litigation and thus, "though concededly 'procedural,' may be of as great importance to litigants as many a 'substantive' doctrine . . . ." 363 U. S., at 650. Since there has been shown to be "no discernible difference between the results reached by the two different-sized juries," *Williams* v. *Florida, supra*, at 101 (see also n. 15, *supra*), a reduction in the size of the civil jury from 12 to six plainly does not bear on the ultimate outcome of the litigation.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE POWELL concurs, dissenting.

Rule 13(d)(1) of the Revised Rules of Procedure of the United States District Court for the District of Montana provides:

> "A jury for the trial of civil cases shall consist of six persons . . . ."

Federal Rule Civ. Proc. 48—which came into being as a result of a recommendation of this Court to Congress which Congress did not reject*—rests on a federal statute.

The two Rules do not mesh; they collide. Rule 48 says that the only way to obtain a trial with less than 12 jurors or a verdict short of a unanimous one is by stipulation.

As MR. JUSTICE MARSHALL makes clear in his dissent, while the parties under Rule 48 could stipulate for trial by an 11-man jury, under the Montana District Court rule only six jurors could be required. Since all apparently agree that the framers of Rule 48 presumed there would be a jury of 12 in the absence of stipulation, the only authority which could reduce 12 to six would be the authority that created Rule 48. Neither we nor the District Court, nor the Judicial Conference, nor a circuit court council has the authority to make that change.

Whether the change, if made, would be constitutional is a question I therefore do not reach.

---

*At the time the Rules of Civil Procedure became effective they had to be submitted to Congress by the Court and Congress had 90 days to reject them. 28 U. S. C. § 2072. At that time § 2072 provided that these Rules "shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution." It seems clear beyond peradventure that the draftsmen thought a jury of 12 was required, save as the parties by stipulation waived that right by stipulating to a lesser number.

Mr. Justice Marshall, with whom Mr. Justice Stewart joins, dissenting.

Some 30 years ago, Mr. Justice Black warned his Brethren against the "gradual process of judicial erosion which . . . has slowly worn away a major portion of the essential guarantee of the Seventh Amendment." *Galloway* v. *United States*, 319 U. S. 372, 397 (1943) (dissenting opinion). Today, the erosion process reaches bedrock. In the past, this Court has sanctioned changes in "mere matters of form or procedure" in jury trials, *Baltimore & Carolina Line, Inc.* v. *Redman*, 295 U. S. 654, 657 (1935), and in "pleading or practice" before juries, *Walker* v. *New Mexico & S. P. R. Co.*, 165 U. S. 593, 596 (1897). But before today, we had always insisted that "[w]hatever may be true as to legislation which changes any mere details of a jury trial, it is clear that a statute which destroys [a] substantial and essential feature thereof is one abridging the right." *American Publishing Co.* v. *Fisher*, 166 U. S. 464, 468 (1897). See also *Dimick* v. *Schiedt*, 293 U. S. 474 (1935); *Capital Traction Co.* v. *Hof*, 174 U. S. 1 (1899).

Now, however, my Brethren mount a frontal assault on the very nature of the civil jury as that concept has been understood for some seven hundred years. No one need be fooled by reference to the six-man trier of fact utilized in the District Court for the District of Montana as a "jury." This six-man mutation is no more a "jury" than the panel of three judges condemned in *Baldwin* v. *New York*, 399 U. S. 66 (1970), or the 12 laymen instructed by a justice of the peace outlawed in *Capital Traction Co.* v. *Hof, supra.* We deal here not with some minor tinkering with the role of the civil jury, but with its wholesale abolition and replacement with a different institution which functions differently, produces different

results,[1] and was wholly unknown to the Framers of the Seventh Amendment.[2]

In my judgment, if such a radical restructuring of the

---

[1] Although I consider it ultimately irrelevant to the constitutional issue, see *infra*, at 180, it is still of some interest that variations in jury size do seem to produce variations in function and result. It is, of course, intuitively obvious that the smaller the size of the jury, the less likely it is to represent a fair cross-section of community viewpoints. What is less obvious but nonetheless statistically demonstrable is that the difference between a 12-man and six-man jury in this respect is quite dramatic and likely to produce different results  Professor Zeisel, perhaps our leading authority on the civil jury, has demonstrated this fact through use of a model in which he assumes that 90% of a hypothetical community shares the same viewpoint, while 10% has a different viewpoint. Of 100 12-man juries picked randomly from such a community, 72 would have at least one member of the minority group, while of the 100 six-man juries so selected, only 47 would have minority representation. Moreover, the differences in minority representation produce significant differences in result. Professor Zeisel posits a case in which the community is divided into six groups of equal size with respect to the monetary value they place on a given personal injury claim, with one-sixth evaluating the claim at $1,000, another sixth at $2,000, etc. He also assumes that the damages a jury will award lie close to the average assessment of the damages each individual juror would choose. If one accepts these hypotheses, "[i]t is easy to see that the six-member juries show a considerably wider variation of 'verdicts' than the twelve-member juries. For instance, 68.4% of the twelve-member jury evaluations fall between $3,000 and $4,000, while only 51.4% of the six-member jury evaluations fall in this range. Almost 16% of the six-member juries will reach verdicts that will fall into the extreme levels of more than $4,500 or less than $2,500, as against only a little over 4% of the twelve-member juries. The appropriate statistical measure of this variation is the so-called standard deviation. The actual distribution pattern will always depend on the kind of stratification that is relevant in a particular case but, whatever the circumstances, the six-member jury will always have a standard deviation that is greater by about 42%. This is the result of a more general principle

judicial process is deemed wise or necessary, it should be accomplished by constitutional amendment. See, e. g., Tamm, The Five-Man Civil Jury: A Proposed Constitutional Amendment, 51 Geo. L. J. 120 (1962). It appears, however, that the common-law jury is destined to expire, not with a bang, but a whimper. The proponents of the six-man jury have not secured the approval of two-thirds of both Houses of Congress and three-fourths of the state legislatures for their proposal. Indeed, they have not even secured the passage of simple legislation to accomplish their goal. Instead, they have relied upon the interstitial rulemaking power of the majority of the district court judges sitting in a particular district to rewrite the ancient definition of a civil jury.[3] They have done so, moreover, in the teeth of an Act of Congress and a Federal Rule promulgated by this Court

---

that is by now well known to readers of such statistics as public opinion polls—namely, that the size of any sample is inversely related to its margin of error." Zeisel, . . . And Then There Were None: The Diminution of the Federal Jury, 38 U. Chi. L. Rev. 710, 717–718 (1971).

[2] See *infra*, at 176–177.

[3] Even in the absence of constitutional difficulties, I view this course as an improper use of the local rulemaking power. In *Miner* v. *Atlass*, we held that the statutory procedures surrounding the rulemaking process were "designed to insure that basic procedural innovations shall be introduced only after mature consideration of informed opinion from all relevant quarters, with all the opportunities for comprehensive and integrated treatment which such consideration affords." 363 U. S. 641, 650 (1960). We therefore declined to construe the local rulemaking power as extending to such innovations. *Ibid.* The Court seeks to escape the force of this precedent with the assertion that "the requirement of a six-member jury is not a 'basic procedural innovation.'" I find this statement startling to say the least. Whatever one's view of the constitutionality of six-man juries, surely it cannot be doubted that this shift in a practice of seven hundred years' standing, likely to affect the outcome of hundreds of cases, see n. 1, *supra*, and *infra*, at 177, constitutes a "basic procedural innovation."

which, in my judgment, were designed to guarantee the 12-man civil jury. By approving this mode of procedure, the Court turns the so-called "clear statement" rule on its head. Instead of requiring a clear statement from Congress when it legislates at the limit of its constitutional powers, see, *e. g., Crowell* v. *Benson,* 285 U. S. 22, 62 (1932), my Brethren approve a departure from settled constitutional understanding despite a clear statement from Congress that it intended no such thing. I must respectfully dissent.

I

At the outset, it should be noted that the constitutional issue in this case is not settled by the prior decisions of this Court upholding nonunanimous and six-man criminal juries. See *Apodaca* v. *Oregon,* 406 U. S. 404 (1972); *Johnson* v. *Louisiana,* 406 U. S. 356 (1972); *Williams* v. *Florida,* 399 U. S. 78 (1970). This is true for at least three reasons.

First, *Apodaca, Johnson,* and *Williams* all involved state trials and, therefore, the requirements of the Fourteenth Amendment rather than the Sixth. This case is, of course, distinguishable in that it deals with a federal trial and, therefore, with Bill of Rights guarantees which are directly applicable, rather than applicable only through the incorporation process.[4] Thus, neither *Apodaca, Johnson,* nor *Williams* squarely presented the Court with the problem of defining the meaning of jury trial in a federal context.[5] Indeed, as

---

[4] Indeed, the Seventh Amendment is one of the few remaining provisions in the Bill of Rights which has not been held to be applicable to the States. See, *e. g., Hardware Dealers Mutual Fire Ins. Co.* v. *Glidden Co.,* 284 U. S. 151, 158 (1931); *Wagner Electric Mfg. Co.* v. *Lyndon,* 262 U. S. 226, 232 (1923).

[5] The author of this opinion believes that the Fourteenth Amendment was intended to incorporate fully Sixth Amendment guarantees.

my Brother POWELL's concurring opinion in *Apodaca* and *Johnson* makes plain, there were, as of last Term at least, five Members of this Court who thought that the Sixth Amendment required unanimous jury verdicts in federal cases. See also *Johnson v. Louisiana, supra,* at 395 (BRENNAN, J., dissenting). MR. JUSTICE POWELL argued in that opinion that the "process of determining the content of the Sixth Amendment right to jury trial has long been one of careful evaluation of, and strict adherence to the limitations on, that right as it was known in criminal trials at common law." *Id.,* at 370 n. 6 He concluded that the Sixth Amendment required unanimous federal juries because "[a]t the time the Bill of Rights was adopted, unanimity had long been established as one of the attributes of a jury conviction at common law." *Id.,* at 371. See also *Williams v. Florida, supra,* at 123–125 (opinion of Harlan, J.). It is apparently uncontested that in 1791, common-law civil juries consisted of 12 men. See *infra,* at 177. Thus, to the extent that Sixth Amendment precedent is applicable to Seventh Amendment problems, *Johnson* and *Apodaca* would seem to cut strongly in favor of a 12-man jury requirement in federal court, rather than against such a requirement.

Moreover, even if it is assumed that the holdings in *Apodaca, Williams,* and *Johnson* are readily transferable to a federal context, it still does not follow that the definitions of trial by jury for purposes of the Sixth and Seventh Amendments are necessarily coextensive. The two Amendments use different language and they guarantee different rights. Indeed, as the *Williams* court itself recognized, the approval of six-man juries in crim-

See *Duncan v. Louisiana,* 391 U. S. 145 (1968). Nonetheless, the fact remains that this Court has yet to decide the issues posed by majority verdicts and six-man juries in a purely Sixth Amendment context.

inal cases did not resolve "whether, for example, additional references to the 'common law' that occur in the Seventh Amendment might support a different interpretation." 399 U. S., at 92 n. 30.

The Court today goes to great lengths to show that the reference in the Seventh Amendment to "Suits at common law" speaks only to the type of suit in which a jury is required, not to the type of jury which is required in such suits. However, my brethren totally ignore another textual difference between the Sixth and Seventh Amendments which I consider to be of at least equal significance. Whereas the Sixth Amendment refers only to "an impartial jury," the Seventh Amendment states that "the right of trial by jury shall be *preserved*" (emphasis added). The Seventh Amendment's additional reference to the preservation of the right strongly suggests that the content of that right is to be judged by historical standards.

Certainly, that has been this Court's understanding in the past. In *Dimick* v. *Schiedt,* for example, the Court held that the Seventh Amendment "in effect adopted the rules of the common law, in respect of trial by jury, as these rules existed in 1791," 293 U. S., at 487, and the dissent agreed that the purpose of the Seventh Amendment was "to preserve the essentials of the jury trial as it was known to the common law before the adoption of the Constitution." *Id.,* at 490. In *Baltimore & Carolina Line, Inc.* v. *Redman,* the Court held that the "right of trial by jury thus preserved [by the Seventh Amendment] is the right which existed under the English common law when the Amendment was adopted." 295 U. S., at 657. And in *American Publishing Co.* v. *Fisher,* the Court held that what was guaranteed by the Seventh Amendment was "the peculiar and essential features of trial by jury at the common law." 166 U. S., at 468. It should therefore be

clear that, whereas the words of the Sixth Amendment might be read as permitting a functional approach which measures "Sixth Amendment values," the Seventh Amendment requires a historical analysis geared toward determination of what the institution was in 1791 which the Framers intended to "preserve." See also *Slocum v. New York Life Ins. Co.*, 228 U. S. 364 (1913); *Capital Traction Co.* v. *Hof*, 174 U. S. 1 (1899).

Finally, it is important to note that, whereas the legislative history of the Sixth Amendment tended to support the Court's decision in favor of six-man criminal juries, it is at best ambiguous in the Seventh Amendment context. As the Court pointed out in *Williams*, the Sixth Amendment as originally introduced by James Madison in the House provided "[t]he trial of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, *with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites.*" 1 Annals of Cong. 435 (1789) (emphasis added). The Amendment passed the House in this form, but when it reached the Senate, that body expressly rejected the "accustomed requisites" language, see Senate Journal, Sept. 9, 1789, 1st Cong., 1st Sess., 77, and the Amendment as ultimately adopted contained no reference to the common-law features of jury trial.

In contrast, the history of the Seventh Amendment contains no express rejection of language which would fix the common-law attributes of the civil jury. Indeed, as the Court itself recognizes, the extant history of the Amendment is exceedingly sketchy. See generally Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289 (1966). Undeterred by the absence of source material, however, my Brethren concoct an elaborate theory designed to demonstrate that the Framers did not intend to fix the nature of the civil jury as it existed at common law. As I read the

majority opinion, the theory is based on the following syllogism:

1. The delegates to the Constitutional Convention considered a clause which would have protected the right to a civil jury, but declined to adopt such a provision because state practice varied widely as to the cases in which a civil jury was provided.

2. When the Seventh Amendment was passed, Congress overrode the arguments of those opposed to a constitutional jury : guarantee and decided to provide a federal right of jury trial despite differences between the States as to when jury rights attached.

3. Therefore, in the words of the Court "[w]e can only conclude . . . that . . . the Framers of the Seventh Amendment were concerned with preserving the *right* of trial by jury in civil cases where it existed at common law, rather than the various incidents of trial by jury."

It hardly requires demonstration that this "logic" rests on the flimsiest of inferences. It simply does not follow that because the Amendment was, at one stage rejected because of disparities among the States in the instances in which the jury right attached, its scope is therefore limited to the surmounting of these disparities. Indeed, the opposite conclusion is equally plausible. One could argue that, whereas there was dispute as to the cases in which the jury-trial right would attach, it was common ground between opponents and proponents of the measure that when it did attach, its incidents would be as at common law. Thus, whatever the meaning of the Amendment as to jury usage, the nature of the jury is, by this argument, at its core and agreed to by all parties.

Moreover, even if the Court's chain of reasoning were correct, the argument would still fall, since it is grounded on a faulty major premise. True, the opponents of a jury guarantee at the Constitutional Convention rested

their argument in part on the varying practice in the States as to the cases in which the right of jury trial attached. But a more detailed examination of the debates than the Court's highly selective quotations permit makes clear that the opponents also rested on the differences in the characteristics of jury trial between the States. Thus, when a jury guarantee was first proposed, Mr. Gorham, one of the principal drafters of the Constitution, argued against the proposal, stating: "It is not possible to discriminate equity cases from those in which juries are proper. The Representatives of the people may be safely trusted in this matter." 2 M. Farrand, Records of the Federal Convention 587 (1911) (hereinafter cited as Farrand). But when the proposal came to a final vote, Mr. Gorham made a somewhat different argument: "The *constitution* of Juries is different in different States." *Id.*, at 628 (emphasis added). Similarly, while at one stage James Wilson defended the absence of a jury requirement on the ground that "[t]he cases open to a jury, differed in different states," 3 Farrand 101, he also made a quite different argument:

> "By the constitution of the different States, it will be found that no particular mode of trial by jury could be discovered that would suit them all. The manner of summoning jurors, their qualifications, of whom they should consist, and the course of their proceedings, are all different, in the different States; and I presume it will be allowed a good general principle, that in carrying into effect the laws of the general government by the judicial department, it will be proper to make the regulations as agreeable to the habits and wishes of the particular States as possible; and it is easily discovered that it would have been impracticable, by any general regulation, to have given satisfaction to all. 3 Farrand 164.

Thus, it is clear that opponents of a jury guarantee were concerned not only with the differing rules for when juries were required among the States, but also with the differing content of the jury right itself.[6] To the extent that anything at all can be inferred from the rejection of these arguments, it follows by the Court's own chain of reasoning that the Framers intended to override state differences as to both the cases in which a jury right would attach and the characteristics of the jury itself.

I should hasten to add that I do not mean to embrace that chain of reasoning. In fact, as indicated above, I view the legislative history as far too fragmentary to support any firm conclusion. But I would have thought that the very uncertainty of the legislative history would support a mode of analysis which looked to the jury as it existed at the time the Seventh Amendment was written in order to determine the intent of the Framers. As Mr. Justice Harlan argued:

> "[I]t is common sense and not merely the blessing of the Framers that explains this Court's frequent reminders that: 'The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history.' *Smith* v. *Alabama*, 124 U. S.

[6]·See also George Washington's contemporaneous explanation in a letter to Lafayette for the absence of a jury guarantee ("[I]t was only the difficulty of establishing a mode which should not interfere with the fixed modes of any of the States, that induced the Convention to leave it, as a matter of future adjustment") 3 Farrand 298; and Edmund Randolph's explanation to the Virginia Convention ("I will risk my property on the certainty, that [Congress] will institute the trial by jury in such manner as shall accommodate the conveniences of the inhabitants of every state: the difficulty of ascertaining this accommodation, was the principal cause of its not being provided for") 3 Farrand 309

465, 478 (1888). This proposition was again put forward by Mr. Justice Gray speaking for the Court in *United States* v. *Wong Kim Ark,* 169 U. S. 649 (1898), where the Court was called upon to define the term 'citizen' as used in the Constitution. 'The Constitution nowhere defines the meaning of these words [the Citizenship Clause]. . . . In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution.' 169 U. S., at 654. History continues to be a wellspring of constitutional interpretation. Indeed, history was even invoked by the Court in such decisions as *Townsend* v. *Sain,* 372 U. S. 293 (1963), and *Fay* v. *Noia,* 372 U. S. 391 (1963), where it purported to interpret the constitutional provision for habeas corpus according to the 'historic conception of the writ' and took note that the guarantee was one rooted in common law and should be so interpreted. Cf. *United States* v. *Brown,* 381 U. S. 437, 458 (1965)." *Williams* v. *Florida,* 399 U. S., at 123–124.

When a historical approach is applied to the issue at hand, it cannot be doubted that the Framers envisioned a jury of 12 when they referred to trial by jury. It is true that at the time the Seventh Amendment was adopted, jury usage differed in several respects among the States. See generally Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289 (1966). But, for the most part at least, these differences did not extend to jury size which seems to have been uniform and, indeed, had remained so for centuries. One authority has noted that as early as 1164, the Constitutions of Clarendon provided that "where, in the case of a layman so rich and powerful that no individual dares

to appear against him, 'the sheriff shall cause twelve legal men of the neighbourhood, or of the vill, to take an oath in the presence of the bishop that they will declare the truth about it.'" Wells, The Origin of the Petit Jury, 27 L. Q. Rev. 347 (1911). As Professor Scott wrote, "At the beginning of the thirteenth century twelve was indeed the usual but not the invariable number. But by the middle of the fourteenth century the requirement of twelve had probably become definitely fixed. Indeed this number finally came to be regarded with something like superstitious reverence." A. Scott, Fundamentals of Procedure in Actions at Law 75–76 (1922) (footnotes omitted). See also 1 W. Holdsworth, A History of English Law 324–325 (7th ed. 1956).

To be sure, not every element of English common law was carried over without change in the Colonies. In the case of jury trial, however, "in general this venerable and highly popular institution was adopted in the colonies in its English form at an early date." Reinsch, The English Common Law in the Early American Colonies, in 1 Select Essays in Anglo-American Legal History 412 (1907). As the Court concluded in *Williams* v. *Florida,* "[t]he States that had adopted Constitutions by the time of the Philadelphia Convention in 1787 appear for the most part to have either explicitly provided that the jury would consist of 12, see Va. Const. of 1776, § 8, in 7 F. Thorpe, Federal and State Constitutions 3813 (1909), or to have subsequently interpreted their jury trial provisions to include that requirement." 399 U. S., at 98–99, n. 45.[7]

---

[7] I do not mean to suggest that isolated experiments with juries of different sizes cannot be found in colonial history. Indeed, when one considers the number of jurisdictions and the span of time involved, it would be surprising if there were no aberrations. Some scholars have argued from the few cases involving juries consisting of more or less than 12 that there was no common-law requirement

On the basis of this historical record, this Court has more than once concluded that the Seventh Amendment guarantees the preservation of 12-man juries.

As the Court, speaking through Mr. Justice Gray, said in *Capital Traction Co.* v. *Hof*,

" 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is . . . a trial by a jury of twelve men before an officer vested with authority to cause them

---

as to jury size in the Colonies. See, *e. g.*, Fisher, The Seventh Amendment and the Common Law: No Magic in Numbers, 56 F. R. D. 507 (1973). In fact, however, the cases cited for this proposition seem to constitute no more than the exceptions which prove the rule.

Fisher, for example, bases his thesis on the fact that Maryland used a jury of 10 in one case in 1682 and a jury of 11 in another case that year and that Delaware used juries of 11, 7, and 13 in three cases tried between 1676 and 1705. See *id.*, at 530. But when one remembers that thousands of civil and criminal cases were tried during the prerevolutionary period, these five apparently isolated instances prove virtually nothing. Similarly, South Carolina's provision for a jury of less than 12 in the "Court for the Trial of Slaves and Persons of Color," *ibid.*, was obviously limited to the peculiar circumstance of persons who, at that time, were considered to be without civil rights of any kind. Fisher's reliance on petitions from the citizens of Anson, Orange, and Rowan Counties for juries of less than 12, *ibid.*, is unaccountable since these petitions were in fact rejected and the smaller juries never impaneled. See *id.*, at 530–531, n. 87.

Fisher's final example is particularly revealing. Just prior to the Revolution, New Jersey passed an act providing for six-man juries in small-court cases. *Id.*, at 531. The law was challenged in the case of *Holmes* v. *Walton*, in 1780, in which the defendant argued "the jury sworn to try the above cause and on whose verdict judgment was entered, consisted of six men only, when by the laws of the land it should have consisted of twelve men." *Id.*, at 532 n. 88. The New Jersey Supreme Court rejected this argument and upheld the verdict. A scant month later, however, the New Jersey Legislature reversed this decision and reinstituted the right to 12-man juries. See *ibid.*

to be summoned and empanelled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict . . . . This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion. Yet there are unequivocal statements of it to be found in the books." 174 U. S., at 13–14.

Cf. *Patton* v. *United States,* 281 U. S. 276 (1930); *Maxwell* v. *Dow,* 176 U. S. 581 (1900); *American Publishing Co.* v. *Fisher,* 166 U. S. 464 (1897); *Springville* v. *Thomas,* 166 U. S. 707 (1897).

The Court today elects to abandon the certainty of this historical test, as well as the many cases which support it, in favor of a vaguely defined functional analysis which asks not what the Framers meant by "trial by jury" but rather whether some substitute for the common-law jury performs the same functions as a jury and serves as an adequate substitute for one. It is true that some of our prior cases support a functional approach to an evaluation of procedural innovations which surround jury trials. The Court has in the past upheld such devices as jury interrogatories and reports of special masters as not interfering with the functioning of a common-law jury. See, *e. g., Ex parte Peterson,* 253 U. S. 300 (1920); *Walker* v. *New Mexico & S. P. R. Co.,* 165 U. S. 593 (1897). But see *Dimick* v. *Schiedt,* 293 U. S. 474 (1935). But I know of no prior case which has utilized a functional analysis to evaluate the very composition of the civil jury.

I submit that the reason for the absence of such cases derives from the inherent nature of the problem. It is possible to determine in a principled fashion whether the appurtenances which surround a jury interfere with the essential functioning of that institution. One can

evaluate whether additur, for example, or directed verdicts interfere with the jury's role as it existed at common law. See, e. g., *Galloway* v. *United States,* 319 U. S. 372 (1943); *Dimick* v. *Schiedt, supra.* But the composition of the jury itself is a matter of arbitrary, *a priori* definition. As Mr. Justice Harlan argued "[t]he right to a trial by jury . . . has no enduring meaning apart from historical form." *Williams* v. *Florida,* 399 U. S., at 125 (separate opinion).

It is senseless, then, to say that a panel of six constitutes a "jury" without first defining what one means by a jury, and that initial definition must, in the nature of things, be arbitrary. One could, of course, define the term "jury" as being a body of six or more laymen. But the line between five and six would then be just as arbitrary as the line between 11 and 12. There is no way by reference to abstract principle or "function" that one can determine that six is "enough," five is "too small," and 20 "too large." [8] These evaluations can only be made by reference to a hypothetical ideal jury of some arbitrarily chosen size. All one can say is that a jury of six functions less like a jury of 12 than would

---

[8] The Court asserts that "[w]hat is required for a 'jury' is a number large enough to facilitate group deliberation combined with a likelihood of obtaining a representative cross section of the community." See *ante,* at 160 n. 16. We can bypass for the moment the intriguing question of where the majority finds this requirement in the words of the Seventh Amendment. For our purposes, it is sufficient to note that, upon examination, this "test" turns out to be no test at all. It may be that the ideal jury would provide "enough" group deliberation and community representation. But the question in this case is how much is "enough." Obviously, the larger the jury the more group representation it will provide. See n. 1, *supra.* Merely observing that a certain level of group representation is constitutionally required fails to tell us what that level is. And, more significantly, it fails to tell us how to go about deciding what that level is.

a jury of, say eight, but more like a jury of 12 than would a jury of three.[9] Although I think it clear that my Brethren would reject, for example, a jury of one, the Court does not begin to tell us how it would go about drawing a line in a nonarbitrary fashion, and it is obvious that in matters of degree of this kind, nonarbitrary line drawing is a logical impossibility.

Of course, there is nothing intrinsically wrong with drawing arbitrary lines and, indeed, as argued above, in order to resolve certain problems they are essential. Thus, this Court has not hesitated in the past to rely on arbitrary demarcations in cases where constitutional rights depend on matters of degree. See, e. g., Burns v. Fortson, 410 U. S. 686 (1973). But in cases where arbitrary lines are necessary, I would have thought it more consonant with our limited role in a constitutional democracy to draw them with reference to the fixed bounds of the Constitution rather than on a wholly ad hoc basis.

I think history will bear out the proposition that when constitutional rights are grounded in nothing more solid than the intuitive, unexplained sense of five Justices that a certain line is "right" or "just," those rights are certain to erode and, eventually, disappear altogether. Today, a majority of this Court may find six-man juries to represent a proper balance between competing demands of expedition and group representation. But as dockets become more crowded and pressures on jury trials grow, who is to say that some future Court will not find three, or two, or one a number large enough to satisfy its unexplicated sense of justice? It should

---

[9] It thus will not do to argue, as has my Brother WHITE, that one "can get off the 'slippery slope' before he reaches the bottom. . . ." Williams v. Florida, 399 U. S. 78, 91 n. 28 (1970). This begs the question how one knows at what point to get off—a question for which the Court apparently has no answer.

be clear that constitutional rights which are so vulnerable to pressures of the moment are not really protected by the Constitution at all. As Mr. Justice Black never tired of arguing, "the accordion-like qualities of this philosophy must inevitably imperil all the individual liberty safeguards specifically enumerated in the Bill of Rights." *Rochin* v. *California,* 342 U. S. 165, 177 (1952) (Black, J., concurring). See also *Duncan* v. *Louisiana,* 391 U. S. 145, 169 (1968) (Black, J., concurring).

Since some definition of "jury" must be chosen, I would therefore rely on the fixed bounds of history which the Framers, by drafting the Seventh Amendment, meant to "preserve." I agree with MR. JUSTICE POWELL's observation in the Sixth Amendment context that determining the content of the right to jury trial should involve a "careful evaluation of, and strict adherence to the limitations on, that right as it was known . . . at common law." *Johnson* v. *Louisiana,* 406 U. S., at 370 n. 6 (separate opinion). It may well be that the number 12 is no more than a "historical accident" and is "wholly without significance 'except to mystics.'" *Williams* v. *Florida, supra,* at 102. But surely there is nothing more significant about the number six, or three, or one. The line must be drawn somewhere, and the difference between drawing it in the light of history and drawing it on an ad hoc basis is, ultimately, the difference between interpreting a constitution and making it up as one goes along.

## II

The arbitrary nature of the line which must be drawn in determining permissible jury size highlights another anomaly in the Court's opinion. Normally, in our system we leave the inevitable process of arbitrary line drawing to the Legislative Branch, which is far better equipped to make ad hoc compromises. In the past, we

have therefore given great deference to legislative decisions in cases where the line must be drawn somewhere and cannot be precisely delineated by reference to principle. This Court has involved itself in the sticky business of separating cases along a continuum only when the Constitution clearly compels it to do so and when the legislature has plainly defaulted.

Today, the Court turns this practice inside out. It rejects what I take to be a clearly articulated legislative decision—a decision, incidentally, which is fully consonant with constitutional requirements—in order to draw its own arbitrary line. It does so, moreover, without any explanation for why it finds the legislative determination unsatisfactory and, indeed, with barely any explanation at all.

A

Title 28 U. S. C. § 2072 requires that the Rules of Civil Procedure promulgated by this Court "shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution." As the Court recognizes, this requirement is made applicable to local rules of procedure by 28 U. S. C. § 2071, which requires that "[s]uch rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court."

The Court's treatment of this statutory requirement is, to say the least, peculiar. When explicating the Seventh Amendment, my Brethren hold that the Framers intended to govern only the types of trials in which the jury right attaches rather than to fix the common-law characteristics of the jury. Their reason for reaching this conclusion is that the Seventh Amendment, by its terms, guarantees the right to a jury trial "[i]n suits at common law" and not as it existed at common law. This language, the Court says, "is not directed to jury

characteristics, such as size, but rather defines the kind of cases for which jury trial is preserved, namely, 'suits at common law.' " *Ante,* at 152. This argument from the language of the Seventh Amendment is fair enough, although for the reasons given in the preceding section, I find it ultimately unpersuasive. But what, then, are we to say when interpreting a provision which guarantees jury trials, not "in suits at common law," but "as at common law"? By the Court's own reasoning, it would seem that this phrase should be read to guarantee the preservation of jury characteristics as they existed at common law.

Uninhibited by the seeming restraints of its own logic, however, my Brethren proceed to read this phrase to preserve juries in cases tried at common law in the face of the merger of law and equity. But if we are again to take the Court at its own word, this is precisely the result achieved by the Seventh Amendment of its own force. There is, of course, a well-recognized canon of construction which requires courts to read statutory provisions so that, when possible, no part of the statute is superfluous. See, *e. g.,* 2 J. Sutherland, Statutes and Statutory Construction § 4705 (3d ed. 1943), and cases cited therein. Yet the Court's reading of this statute creates not just a redundancy, but a double redundancy. If the framers of § 2072 had intended merely to preserve jury trials in cases at common law, then no statute at all would have been necessary since, as the Court recognizes, the Seventh Amendment by itself is sufficient to accomplish this purpose. Yet Congress not only passed a statute—it adopted a provision securing trial by jury both "as declared by the Seventh Amendment" and "as at common law." If one accepts for the moment the Court's premise that the Seventh Amendment preserves only the right to juries in common-law cases,

Congress' addition of the phrase "as at common law" is explicable only if the legislature also intended to protect jury characteristics from change.

My Brethren chose to reject this clear meaning of the statute and to read it instead in a manner which not only makes it redundant but also, as demonstrated in the previous section, raises the gravest constitutional questions. Yet the only argument I can discern for reaching this result is the Court's stated reluctance to "saddle archaic and presently unworkable common-law procedures upon the federal courts." With all respect, I had not thought it our function to determine which statutory requirements are "archaic" and "unworkable" and to enforce only those which we find to be efficient and up to date. The Court asserts that "[i]f Congress had meant to prescribe . . . common-law features [for juries] . . . 'it knew how to use express language to that effect.'" But I, for one, would be hard pressed to think of language which more expressly guarantees the jury's common-law features than the statement that the right of trial by jury shall be preserved "as at common law." So long as this is the command of Congress, I had thought it our duty to obey, no matter how "archaic" and "unworkable" the statutory requirement.

## B

Nor is the statute the end of the matter. Federal Rule Civ. Proc. 48 provides in relevant part that "[t]he parties may stipulate that the jury shall consist of any number less than twelve." It hardly need be demonstrated that this provision is flatly inconsistent with local Rule 13 (d) (1). The number 11, for example, falls within the class of "any number less than twelve," so that Rule 48 requires that the parties be permitted to stipulate to a jury of 11. Yet the local rule, which requires that "[a]

jury for the trial of civil cases shall consist of six persons" clearly would not permit a jury of 11, even if the parties stipulated to such a jury.

The Court's contention that Rule 48 "deals only with a stipulation *by '[t]he parties'*" and "does not purport to prevent *court rules* which provide for civil juries of reduced size," *ante,* at 164, therefore passes my understanding. It is true enough that Rule 48 deals with stipulations by the parties, but it expressly says that the court rules must permit such stipulations so long as the number stipulated is "any number less than twelve." Since the numbers seven through 11 are numbers less than 12, and since the local rule does not permit stipulations of these numbers, the two rules are in conflict and the local rule must therefore fall. See 28 U. S. C. § 2071; Fed. Rule Civ. Proc. 83.

Of course, Rule 48 does not on its face guarantee a jury of 12. That function is arguably performed by Rule 38 (a) which provides that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." But as the Court itself recognizes, the framers of Rule 48 clearly presupposed a jury of 12 in the absence of stipulation. Indeed, there is no way to make sense of a provision which permits stipulations of any number less than 12 unless one assumes that in the absence of a stipulation, the jury would consist of 12. I am thus once again at a loss to understand why the Court strains to escape the plain intention of the Rule's drafters in order to wrestle with grave constitutional questions that could easily have been avoided.

## III

It might appear to some anomalous after *Williams* to hold that 12-man civil juries are constitutionally required in federal cases. As Judge Wisdom has argued, "[w]hat-

ever one considers the role of a civil jury and whatever importance attaches to that role, . . . no one has ever contended that the function of the civil jury is *more* important than that of the criminal jury." *Cooley* v. *Strickland Transportation Co.,* 459 F. 2d 779, 781 (1972).

There is, of course, force to that point and a certain rudimentary logic to the proposition that if a man is entitled to a jury of only six when his very liberty is at stake, he should not be entitled to more when mere property hangs in the balance. But our function is limited to interpreting the Constitution. We are not empowered to decide as a matter of policy the cases in which 12-man juries should be guaranteed. As argued above, our prior decision on jury size arose in the state context and involved interpretation of a different constitutional provision. That decision simply does not require that we approve six-man federal juries in civil cases. As Mr. Justice Sutherland observed almost 40 years ago when the common-law jury was under attack from a different source, "this court in a very special sense is charged with the duty of construing and upholding the Constitution; and in the discharge of that important duty, it ever must be alert to see that a doubtful precedent be not extended by mere analogy to a different case if the result will be to weaken or subvert what it conceives to be a principle of the fundamental law of the land." *Dimick* v. *Schiedt,* 293 U. S., at 485.

I find that response dispositive. The Constitution is, in the end, a unitary, cohesive document and every time any piece of it is ignored or interpreted away in the name of expedience, the entire fragile endeavor of constitutional government is made that much more insecure. This observation is as pertinent to the Seventh Amendment as it is to the First, or Fourteenth, or any other part of the Constitution. Indeed, as the *Dimick* court held, "[m]aintenance of the jury as a fact-finding body is of

such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Id.,* at 486. In my judgment, my Brethren have not given this curtailment of the jury right the careful scrutiny which the problem demands. I must, therefore, respectfully dissent.

MR. JUSTICE POWELL, dissenting.

I share the view of MR. JUSTICE DOUGLAS that local Rule 13 (d)(1) is incompatible with the Federal Rules of Civil Procedure, and this would require a reversal of the present case. Accordingly I do not reach the constitutional issue under the Seventh Amendment which is addressed by MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL in their scholarly opinions, *ante,* pp. 149, 166. Cf. *Johnson* v. *Louisiana,* 406 U. S. 356, 366–380 (1972) (opinion of POWELL, J.).