**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff,**

v.

**NEBRASKA PUBLIC POWER DISTRICT, Defendant.**

No. 4:CV94–3182.

United States District Court, D. Nebraska.

July 22, 1996.

Rodney M. Confer, Lincoln, NE, Martin D. Schneiderman, Linda S. Stein, F. Franklin Amanat, Washington, D.C., Sara J. Whitley, Fort Worth, TX, for Plaintiff.

R. Dennis Wright, M. Michael Gill, Kansas City, MO, James A. Eske, Lincoln, NE, Harold Hadland, Columbus, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Burlington Northern Railroad Company (BN) sued the Nebraska Public Power District (NPPD). BN alleged in two counts that it was entitled to declaratory relief regarding a complex contract between BN and NPPD that required BN to transport coal to a NPPD power plant. NPPD counterclaimed requesting declaratory relief on one counterclaim and damages on another.

Because this case is complex and because I was dissatisfied with the pretrial conference order, I required counsel for the parties to attend a hearing before me to simplify and clarify the pretrial conference order. After more than six days of effort, those hearings have now been concluded.

Pursuant to Federal Rule of Civil Procedure 39(a)(2) I now find and conclude that NPPD has no right to a jury trial regarding its so-called "non-mediation claims" and that NPPD has no right to a jury trial regarding BN's so-called "RCAF" claim. As to these claims BN agrees that neither party has a right to a jury trial.

Accordingly, I will order that NPPD's "non-mediation claims" and the BN "RCAF" claim shall be tried entirely to the court without a jury, and NPPD's jury demand shall be stricken.[1] My reasons for this decision are stated in the following portions of this memorandum.

## I. BACKGROUND

In order to understand the issues that give rise to my decision it is necessary to have a passing familiarity with: (1) section 14 of the contract; (2) the amendment of the contract regarding the index and the 1989 concession by BN regarding a particular index; (3) the efforts of the parties to mediate this case prior to suit; (4) the pertinent procedural history of this case through the date of the pretrial conference; and (5) the efforts of the court to clarify the pretrial conference order.

### A. Section 14

The contract at issue requires BN to haul coal for NPPD and the contract requires NPPD to pay BN for such transportation. The contract established the price that BN would receive and NPPD would pay for the transportation services provided by BN. Because the contract, which became effective in 1983, extended until December 31, 1996 the contract also established two methods to change the price from time to time.

The first method was an adjustment of the price on a quarterly basis using a formula. Essentially, the formula was this: latest ICC index, minus previous ICC index, divided by previous ICC index, multiplied by the prior effective rate, equals the increase or decrease for the quarter.

The second method was a process explicitly intended to "amend" the contract. This "amendment" process is found in section 14 of the contract.

Section 14 of the contract, which is at the center of the dispute in this case, provides as follows:

Section 14. *ECONOMIC HARDSHIP*

A. It is the intent of the parties hereto that the Effective Rate shall represent a reasonable cost to Utility in return for reliable, high volume Unit Train transportation service and that such rate shall compensate BN for such transportation services by covering BN's operating costs and

---

1. The parties and the court are in agreement that NPPD is entitled to a jury trial on its so-called "mediation claim." This claim essentially asserts that BN did not mediate in good faith in accordance with the contract and hence breached the contract causing NPPD to suffer damage.

costs of capital for providing such services and providing a reasonable profit, assuming honest and efficient management by BN.

Although the Base Rate, as of the Effective Date of this Agreement, is a reasonable cost to Utility and covers BN's operating costs and costs of capital for providing the services hereunder plus a reasonable profit, the parties recognize that unforeseen changes in circumstances in the future might cause the Effective Rate to no longer reflect the parties' intentions. The parties intend that the utilization of the ICC Mid–Quarter Index[2] shall not understate or overstate changes in BN's costs directly related to the services provided by BN under this Agreement and shall neutralize the effects of inflation.

B. In consideration of paragraph A above, the parties desire to provide a procedure for amending the Effective Rate, not to exceed plus or minus 15% of the applicable Effective Rate, and/or utilization of the ICC Mid–Quarter Index pursuant to the following.

Within 30 days after January 1, 1988 and 30 days after January 1, 1993, if either Utility or BN believes that the Effective Rate and/or the utilization of the ICC Mid–Quarter Index for the third quarter of 1987 or 1992, as the case may be, do not reflect the above intentions and agreements of the parties, then, this section may be invoked, within said 30 day periods only, by written notice thereof by either party to the other. Said notice shall contain the following:

(1) A statement of why the party giving said notice believes that said applicable Effective Rate or the utilization of the ICC Mid–Quarter Index is not consistent with the intent of the parties as described above.

(2) The amount of increase or decrease, not to exceed 15% of said applicable Effective Rate, which the party giving said notice believes should be added or subtracted from said applicable Effective Rate.

(3) The adjustment, if any, proposed to the utilization of the ICC Mid–Quarter Index.

Within 30 days after receipt of said notice, the parties shall meet at a mutually convenient time and place to begin negotiations to attempt to agree upon a change in the Effective Rate and/or the utilization of the ICC Mid–Quarter Index. Prior to such negotiations, a party giving a notice hereunder shall provide to the other party access to its financial records necessary to properly investigate such party's requested adjustments. Each party agrees to provide to the other whatever documentation or studies it may have to support its position in the negotiations. Each party shall preserve in confidence all financial records and other financial documents provided by the other party under paragraph B and paragraph C of this Section 14 and shall make no disclosure of the contents thereof except to representatives of the parties who also agree to preserve said contents in confidence.

If, after the Effective Date of this Agreement, BN achieves management induced increased productivity, Utility may not initiate a request for a decrease in the Effective Rate based upon said productivity increases. Utility may, however, use the fact of said increased productivity to support Utility's position with respect to a request by BN to increase the Effective Rate or to adjust the utilization of the ICC Mid–Quarter Index. The parties recognize that the ICC may change the ICC Mid–Quarter Index to reflect railroad productivity. The parties shall be bound to continue to use the ICC Mid–Quarter Index, in accordance with Section 3 hereof, notwithstanding the manner in which railroad productivity is treated by the ICC.

If the negotiations result in the parties agreeing upon a change in the Effective Rate and/or in the utilization of the ICC Mid–Quarter Index, then the parties shall

---

**2.** As noted later this reference was subsequently amended and the index referenced in the text is now known as the Quarterly Rail Cost Adjustment Factors (RCAF). Thus the "index" mentioned in the text now refers to the "RCAF."

sign an amendment to this Agreement reflecting such changes.

C. If Utility desires to commence shipments of artificially dried Coal during the term of this Agreement, it may do so upon written notice thereof to BN, provided such notice is given at least 12 months prior to commencement of shipments of such dried Coal. If such dried Coal has physical characteristics which increase BN's costs of transporting such dried Coal above the costs of transporting nondried Coal, BN may give notice to Utility within 30 days of Utility's said notice to BN stating its desire to renegotiate the applicable Effective Rate. Such notice to Utility shall specify the amount of increase BN believes should be added to the Effective Rate to compensate BN for any additional costs of transporting dried Coal above the costs of transporting nondried Coal. Within 30 days of such notice to Utility, the parties shall meet at a mutually convenient time and place to begin negotiations to attempt to agree upon a change in the Effective Rate. Prior to such negotiations, BN shall provide Utility access to such financial records which are necessary to properly investigate BN's requested changes related to BN's increased costs of transporting dried Coal above the costs of transporting nondried Coal. Each party agrees to provide to the other whatever documentation or studies it may have to support its position in the negotiations. If the negotiations result in the parties agreeing upon an increase in the Effective Rate, then the parties shall sign an amendment to this Agreement reflecting an increase. During the pendency of said negotiations, or mediation or court proceedings as provided in paragraph D of this Section, the parties shall continue to abide by all provisions of this Agreement and such dried Coal shall be transported at the applicable Effective Rate. Any such increase in the Effective Rate agreed to by the parties or determined by procedures set out in paragraph D of this Section shall be retroactively or prospectively applied to the commencement of shipments of dried Coal. If such increase to the Effective Rate is retroactively applied, Utility shall pay BN within 90 days of the date the parties amend the Agreement reflecting such increase in the Effective Rate or the date the court finally determines and orders an increase is required pursuant to this Agreement. In the event a retroactive payment is required, Utility shall pay, in addition, simple interest at the statutory rate in effect in the State of Nebraska on judgments. Interest on the amount of increase in each payment which is increased retroactively shall run from the date such payment was due until such increase is paid.

D. If the parties cannot agree upon any proposed adjustment as set forth in this Section, such questions or controversy shall be submitted for mediation. Such questions or controversy shall be submitted to three competent and disinterested mediators, familiar with the subject matter. The party demanding such mediation shall give the other party notice of such demand, stating specifically the question or questions to be submitted for decision and nominating a person who has the required qualifications to act as one mediator. The party to whom such notice is given shall appoint a second mediator having like qualifications and give the party demanding mediation notice in writing of such appointment within twenty (20) days from the time of receipt of the demanding party's notice. If the responding party has not timely notified the party demanding mediation of its nomination of a second competent and disinterested person as mediator, the party making the demand may make such selection. The first and second mediators chosen shall select a third, and if the mediators chosen shall be unable to agree upon a third mediator within a period of twenty (20) days from the date of appointment of the second mediator, the third mediator may be appointed upon ten (10) days' notice upon motion or application of either party by the Chief Judge (or Acting Chief Judge) of the United States District Court for the District of the State of Nebraska.

Upon selection of the mediation board of three members, the board shall proceed at

once with reasonable diligence to inquire into and to make recommendations to resolve the questions and controversy at issue as disclosed in such notice of mediation. Such board shall give to both parties reasonable notice of the time and place where the board will take such evidence as may be deemed reasonable or as either party may submit, without requiring witnesses to be sworn. The board will hear arguments of counsel or other representatives of the parties. If any mediator shall decline or fail to act, the party by whom he was chosen or said judge shall appoint another to act in his place. After considering the evidence and hearing the testimony and arguments which may be submitted by each party, the board shall make recommendations in writing within ninety (90) days of the final submissions by the parties, regarding the matters submitted to mediation. The recommendations shall not be binding on either party.

If either party does not agree to accept the recommendations of the mediators and the parties continue to be unable to resolve the questions or controversy presented to the mediators, an action for a declaratory judgment to resolve the questions or controversy may be instituted and maintained in any Court of competent jurisdiction located in the State of Nebraska. Neither party shall raise the defense of the lack of personal jurisdiction over that party.

Each party shall pay its own costs incurred in any such mediation and shall pay the fees and expenses charged by the mediator appointed by such party. The party requesting mediation shall pay the fees and expenses charged by the third mediator and any other costs of such mediation.

E. During the pendency of said negotiations, mediation or court proceedings, the parties shall continue to abide by all provisions of this Agreement. Any new Effective Rate or adjustment to the utilization of the ICC Mid–Quarter Index agreed to by the parties pursuant to the provisions of paragraph B. of this Section or determined by the procedures set out in paragraph D.

of this Section shall be effective as of July 1, 1988 or July 1, 1993, as the case may be. The party which is due any sum as a result of a retroactive application of the said new Effective Rate or adjustment to the utilization of the ICC Mid–Quarter Index shall be paid within 120 days after the date said new Effective Rate or adjustment to the ICC Mid–Quarter Index is determined by the parties or by a final judgment of a court of competent jurisdiction.

## B. The "RCAF"

The original contract used the ICC Mid–Quarter Index of railroad costs to increase or decrease the so-called "Effective Rate" (price) of the contract. Subsequent to the execution of the contract the ICC began to publish an index known as the Quarterly Railroad Cost Adjustment Factors (RCAF). The third amendment to the contract substituted the "RCAF" for the ICC "Mid–Quarter Index."

In the spring of 1989 the ICC published two indices: (1) the RCAF(U) which did not include railroad productivity, and (2) the RCAF(A) which included railroad productivity. The ICC has remained neutral about whether particular contracts required the use of RCAF(U) or RCAF(A). The third amendment to the contract did not state in words [3] what index as between the RCAF(U) or RCAF(A) was to be used.

In April of 1989 NPPD notified BN that it believed that the effective rate under the contract should be adjusted by reference to the RCAF(A). The practical impact of using RCAF(A) was to reduce the rate NPPD paid to BN by passing on to NPPD increases in railroad productivity.

BN acceded to NPPD's April 1989 request in late April of 1989. Since that time the parties have utilized the RCAF(A) to adjust the effective rate.

## C. The Mediation

In 1993 NPPD advised BN that it was making two claims under section 14. The

---

**3.** There is a dispute about whether a statutory reference was the equivalent of specifying which of the two RCAFs applied. For purposes of the jury trial issue addressed in this opinion I need not resolve that dispute.

parties negotiated but were unable to reach agreement. Thereafter NPPD requested mediation pursuant to section 14.

On June 21, 1994 the matter was submitted to mediation. The mediation was concluded on June 22, 1994. On June 22, 1994 at 2:04 p.m. this suit was filed by BN.

### D. Pertinent History from Start to Pretrial Conference

BN's complaint, based upon diversity jurisdiction, asked for declaratory relief in two counts. In count I BN asserted that: (a) there was no basis for reducing the "Applicable Effective Rate" (filing 1 ¶ 12) and (b) there was no contractual basis for modifying how the RCAF (no matter how defined) was used (*id.* ¶ 13). In count II BN asserted that the parties were incorrectly using the RCAF(A) instead of the RCAF(U). (*Id.* ¶ 18).

As a prayer for relief BN asked for all the relief it was entitled to including a declaration that as to count I NPPD was not entitled to change the effective rate or modify how the RCAF (however defined) was used (*id.* ¶¶ (a)–(d) at page 6). As to count II BN asked for a declaration that the appropriate index was the RCAF(U). (*Id.* ¶ (e) at pages 6–7.) BN did not make a demand for a jury trial.

NPPD responded by counterclaim requesting a declaratory judgment on count I and damages on count II. (Filings 11 and 31.)

In count I of the counterclaim NPPD asserted that: (a) NPPD was entitled to a 15 percent reduction in the effective rate and reimbursement of all monies paid to BN by NPPD in excess thereof (filing 11 ¶ 56); and (b) NPPD was entitled to amend the index so that the index and the effective rate accurately stated BN's costs directly related to the services provided by BN to NPPD (*id.* ¶ 60). In most respects count I of NPPD's counterclaim was a mirror image of count I of BN's complaint.

In the amended prayer for relief on count I of the counterclaim (filings 11 and 31) NPPD requested a "declaratory judgment" that:

 a. The 3Q92 Effective Rate is not a reasonable cost to NPPD and shall be reduced pursuant to Section 14 of the Amended Contract by 15%, said reduction to be effective as of July 1, 1993, and thereafter;

 b. NPPD is entitled to a reimbursement from BN in an amount equal to the amount NPPD overpaid BN since July 1, 1993, as determined by the new Effective Rate prayed for herein;

 c. The utilization of the index under the Amended Contract did not conform with Section 14.A of the Amended Contract and, as a result, shall be amended by reducing said index and Effective Rate, effective as of July 1, 1993, and thereafter, by the amount by which the utilization of the index did not conform with Section 14.A of the Amended Contract; and

 d. NPPD is entitled to a reimbursement from BN in an amount equal to the amount NPPD overpaid BN since July 1, 1993, as determined by the amendment to the utilization of the index prayed for herein;

 e. For such other relief as the Court deems appropriate.

In count II NPPD alleged that BN breached the contract by prematurely filing suit in contravention of specific language contained in section 14 (filing 11 ¶ 71) and by failing to mediate in good faith (*id.* ¶ 72). NPPD sought damages regarding count II. (*Id.* at page 19.)

NPPD did not file a counterclaim with regard to BN's count II respecting the RCAF(A) versus RCAF(U) issue. However, NPPD asserted various affirmative defenses.

In a timely manner NPPD demanded a jury trial, to wit: "NPPD demands a jury trial on all issues, including all counts of BN's Complaint and all counts of NPPD's counterclaim." (*Id.* at page 19.)

BN moved to strike the NPPD jury demand regarding count I of NPPD's counterclaim respecting whether NPPD was entitled to rate reduction of 15 percent and related reimbursement and whether NPPD was entitled to a change in the utilization of the index and related reimbursement. (Filing 26.)

BN also moved to strike the NPPD jury demand insofar as it related to all of BN's claims. (*Id.*) BN conceded that NPPD was entitled to a jury trial on count II of NPPD's counterclaim. Alternatively, BN requested that I bifurcate trial of all claims such that NPPD's damage claim (count II of the counterclaim) would be tried after trial of all the other claims. (Filing 27 ¶ 3.)

I denied the motion to strike the jury demand, but ordered that trial of NPPD's count II damage claim would follow trial of all other claims. (Filing 33.) With regard to the jury trial issue, I reasoned (wrongly) that NPPD was entitled to a jury trial on BN's claims and count I of NPPD's counterclaim because those claims were like a breach of contract action. (*Id.* at 2.) However, I notified the parties that difficult issues were presented regarding the proper role of the jury respecting those claims. (*Id.* at 2 n. 2.) I asked the parties to address those jury issues in the pretrial conference order. (*Id.*)

A pretrial conference order was drafted by the parties and presented to the magistrate judge who signed the order. (Filing 92). The parties could not agree on the controverted issues to be tried. (Filing 92 ¶ C & attachments.) Moreover, the parties were specifically unable to agree as to the proper role of the jury regarding BN's claims and count I of the NPPD counterclaim. (*Id.*)

### E. Court's Effort to Clarify Pretrial Conference Order

In an effort to clarify the pretrial conference order (and to resolve other issues related to the trial of this case) I ordered counsel for the parties to appear before me. After much effort the claims and defenses were clarified and condensed.

First, there are four general controverted issues that require trial. These four issues represent the four discrete claims for relief asserted in BN's complaint and NPPD's counterclaim.

The four controverted issues are these:

1. Is NPPD entitled to a change in the Effective Rate, as that Effective Rate is set forth in the contract, as of the third quarter of 1993, because the conditions for change of the Effective Rate, which are described in section 14 of the contract, exist? And, if NPPD is entitled to a change in the Effective Rate, by how much should the Effective Rate be decreased, not to exceed 15 percent to determine the amount of refund (if any) due NPPD? (NPPD's non-mediation claim 1.)

2. Whether NPPD is entitled to a change in the "utilization of the . . . Index," as "utilization of the . . . Index" is set forth in the contract, as of the third quarter of 1993, because the conditions for change in the "utilization of the . . . Index," which are described in section 14 of the contract, exist. And if so, what is the proper change in the "utilization of the . . . Index" to determine the refund (if any) due NPPD? (NPPD's non-mediation claim 2.)

3. Should the RCAF(U) be used pursuant to section 3(B) and section 14(B) of the contract, and if the RCAF(U) is to be used what is the Effective Rate as of the date of judgment?[4] (BN's RCAF claim.)

4. Before filing suit did BN comply with the provisions of section 14 of the contract and the implied covenant of good faith, and, if not, what damages (if any) are due NPPD? (NPPD's mediation claim.)

Second, with respect to affirmative defenses, BN had no such defenses. NPPD asserted various affirmative defenses to the one claim asserted by BN.

Specifically, BN stated that it has no affirmative defenses to NPPD's non-mediation claims. However, BN indicated that it would argue that NPPD was precluded from using data prior to July 1, 1988 to support its claims for change because of the contractually preclusive impact of a 1988 amendment to the contract.

With regard to BN's RCAF claim, NPPD asserted eight affirmative defenses: (1) waiver; (2) estoppel; (3) failure to seek a change in the RCAF in accordance with section 14 of the contract; (4) ratification; (5) latches; (6)

---

4. NPPD believes that October 1, 1996 rather than the date of judgment is the appropriate date if the date of judgment is prior to October 1, 1996. This dispute need not be resolved now in order to resolve the jury trial issue.

accord and satisfaction; (7) course of performance; and (8) bad faith.[5] None of these defenses requested affirmative relief on the part of NPPD.

Respecting NPPD's mediation damage claim BN has no affirmative defenses.

In summary, after the requests for relief are carefully scrutinized there are four *claims* to be adjudicated.[6] NPPD claims it is entitled to declaratory relief in the form of an amendment to the contract (including a declaration that it is entitled to a refund of monies) on its two non-mediation claims, and NPPD further claims it is entitled to damages for breach of contract on its mediation claim. BN claims it is entitled to declaratory relief on its RCAF claim in the form of a declaration that RCAF(U) not RCAF(A) applies, and that the Effective Rate should be stated to reflect that index. The only affirmative *defenses* raised with regard to these four claims for relief are the affirmative defenses asserted by NPPD in defense of BN's RCAF claim, and none of those defenses request affirmative relief on the part of NPPD.

## II. DISCUSSION

I first examine the general principles that pertain to whether a litigant, who has made a timely request, is entitled to a jury trial in a contract case when a party has requested declaratory relief and the case is predicated upon diversity jurisdiction. I then apply those principles to the case at hand.

## A. The Principles

There are seven general principles that apply to determine whether NPPD is entitled to a jury trial on its non-mediation claims and on BN's RCAF claim. I briefly set forth those principles next.

■ First, the Seventh Amendment preserves the historic English common law right to a jury trial. *Markman v. Westview Instruments, Inc.*, — U.S. —, —, 116 S.Ct. 1384, 1389, 134 L.Ed.2d 577 (1996) (citing *United States v. Wonson*, 28 F.Cas. 745, 750 (No. 16, 750 (CC Mass. 1812))). *See* 9 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2302, at 17 & n. 4 (1995). This essentially means that the Seventh Amendment applies to " 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.' " *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989) (quoting *Parsons v. Bedford*, 3 Pet. 433, 447, 7 L.Ed. 732 (1830)). (emphasis in original.)

■ Second, although there is no longer a distinction in federal civil procedure regarding "law" and "equity," Fed.R.Civ.P. 1 and 2, the Federal Rules of Civil Procedure guarantee the right to a jury trial regarding "any issue triable of right by a jury." Fed. R.Civ.P. 38(b). Consequently, there is an inherent tension between the historic right to a jury trial that was premised upon "legal"

---

**5.** BN asserted that bad faith had not been properly raised. Moreover, to the extent that this defense was in reality the assertion, in the form of a defense of NPPD's breach of contract mediation claim, the parties agreed that such a claim (if properly asserted as a defense to the RCAF claim) would be presented to the jury in the trial of the mediation claim, without prejudice to BN's argument that even if BN breached its obligation to mediate that such a breach is not a defense to BN's RCAF claim. The parties further agreed that if such a breach was a proper defense to the RCAF claim then the jury's verdict on NPPD's mediation claim would also stand as a verdict on NPPD's mediation-breach defense to BN's RCAF claim. In any event, this defense, no matter how characterized, presented no claim for affirmative relief by NPPD with regard to BN's RCAF claim. In other words, NPPD asserted no counter-claim to BN's RCAF claim.

**6.** With regard to NPPD's non-mediation claims BN had similar claims which obviously requested the opposite relief. Accordingly, since NPPD would have the burden of proof as it was requesting a change (amendment of the contract) it was agreed that BN would in effect withdraw its mirror image claims and simply defend the status quo. Thus, trial would proceed on NPPD's non-mediation claims as if NPPD was the plaintiff and BN the defendant. As to the RCAF claim upon which BN had the burden of proof, the parties agreed that the RCAF claim would be presented during BN's defense to NPPD's non-mediation claims, that rebuttal would be altered to allow NPPD to present counter-evidence regarding the RCAF claim, and that BN would be allowed limited rebuttal thereafter to respond to NPPD's RCAF evidence.

and "equitable" classifications and modern federal civil procedure which for most other purposes ignores those distinctions. 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2302, at 23–24. As a consequence of this tension any effort to determine whether a party is entitled to a jury trial requires "an interpretation of the Seventh Amendment that is both consistent with its historical basis, and capable of integrating modern procedural developments that promote the efficient functioning of the judicial system." *Id.* at 24.

■ Third, even where jurisdiction is predicated upon diversity of citizenship and state law governs the substantive legal issues, federal law, and not state law, governs whether a party is entitled to a jury trial. *Simler v. Conner,* 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963); 9 Wright & Miller, *Federal Practice and Procedure* § 2303.

■ Fourth, when determining whether the Seventh Amendment requires a jury trial a federal court must answer at least one and possibly two questions. *Markman v. Westview Instruments, Inc.,* — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577 (Although patent infringement actions were tried to a jury at common law, the interpretation of the word "inventory" in a patent is exclusively within the province of the court and therefore the judge's construction of the meaning of the disputed term when granting a motion for judgment as a matter of law after a jury verdict did not violate the Seventh Amendment despite the fact that the jury came to a different conclusion as to the meaning of the term.)

Those two questions are: (1) "we ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the Founding or is at least analogous to one that was"; and (2) "[i]f the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." *Id.,* at —— ——, 116 S.Ct. at 1389–1390.

The second part of this test is essentially an effort to determine whether the relief sought is "legal or equitable in nature," and this part of the test is frequently the more important of the two parts because locating precise historical analogies is difficult at best. *Tull v. United States,* 481 U.S. 412, 417–21, 107 S.Ct. 1831, 1835–38, 95 L.Ed.2d 365 (1987). In this portion of the test a court tries to determine "whether the jury must shoulder this responsibility" in order *"to preserve the 'substance of the common-law right of trial by jury.'"* *Markman,* — U.S. at ——, 116 S.Ct. at 1390 (citing *Tull,* 481 U.S. at 426, 107 S.Ct. at 1840) (in turn quoting *Colgrove v. Battin,* 413 U.S. 149, 156, 93 S.Ct. 2448, 2452, 37 L.Ed.2d 522 (1973)) (emphasis in *Markman* ).

■ In this regard, while it is sometimes convenient to define "legal" and "equitable" actions according to whether or not the relief sought is expressed in the form of money, *Granfinanciera,* 492 U.S. at 47–49, 109 S.Ct. at 2793–94, the presence or absence of a request for money as a form of relief does not determine whether a jury must be used. *Tull v. United States,* 481 U.S. at 425–27, 107 S.Ct. at 1839–41. (Seventh Amendment does not guarantee a right to a jury trial to determine amount of civil penalties under the Clean Water Act, but Seventh Amendment did require jury to determine liability under the Act.) Indeed:

> "Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property or reputation—and an equitable action for specific relief—which may include an order providing for ... 'the recovery of specific property *or monies* ...'"

*Bowen v. Massachusetts,* 487 U.S. 879, 893, 108 S.Ct. 2722, 2731, 101 L.Ed.2d 749 (1988) (quoting *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949)) (emphasis in *Bowen* ).

Fifth, while declaratory judgment actions were unknown at common law, 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*

§ 2769, at 758 (1983), Federal Rule of Civil Procedure 57 dealing with declaratory judgment actions expressly protects the right to a jury trial in declaratory judgment actions if that right is otherwise available. Fed. R.Civ.P. 57. ("[T]he right to trial by jury may be demanded under the circumstances and in the manner provided in Rules 38 and 39.") *See also* 28 U.S.C. § 2201–2202 (pertaining to declaratory judgment actions).

■ The determination of whether a party is entitled to jury trial in a declaratory judgment action poses a problem of definition because the general test for the determination of whether a party is entitled to a jury trial is historical, yet history cannot provide a direct answer since there was no declaratory judgment action in 1791. 10A Wright & Miller, et al., *Federal Practice and Procedure* § 2769, at 758. Accordingly, "the solution that has been worked out to this problem is to look to the kind of action in which the issue involved would have been decided if there were no declaratory judgment procedures and to see whether the issue would have been triable of right to a jury in that action." *Id.* at 758 & n. 4. (citing *Johnson v. Fidelity & Cas. Co. of New York*, 238 F.2d 322 (8th Cir.1956)). *See also* 9 Wright & Miller, *Federal Practice and Procedure* § 2312.

■ Sixth, since the right to trial by jury attaches to "claims" and not "defenses," where a party asserts a defense which is otherwise "legal" in nature, but does not ask for affirmative relief, the assertion of a so-called "legal" defense, without a request for affirmative relief, will not trigger a right to a jury trial where the claim asserted against

the defense is equitable. *Owens–Illinois, Inc. v. Lake Shore Land Co., Inc.*, 610 F.2d 1185, 1190–91 (3rd Cir.1979) (In an action for declaratory judgment seeking to determine plaintiff's right under an option to compel in the future specific performance, defenses such as failure of consideration and breach of the lease did not create right to a jury trial as demanded by defendant because the "defendant did not ask for affirmative relief but merely took the position that the plaintiff was not entitled to specific performance.") *See also Kennedy v. Rubin*, 254 F.Supp. 190, 195 (N.D.Ill.1966) (mere existence of a "legal defense," without a claim for relief, did not entitle respondent to a jury trial.)

■ Seventh, accurately determining as a historical matter whether a particular contract action would have been tried to a jury at English common law in 1791 is at best "difficult, and even at times impossible," 5 Arthur L. Corbin, *Corbin on Contracts*, § 1103, at 557 (1964), but it is possible to generally categorize certain types of contract cases where juries were or were not present, and those categories are these: (1) a breach of contract action claiming damages was tried to a jury,[7] 9 Wright & Miller, *Federal Practice and Procedure* § 2316, at 125–26 (citing *Ross v. Bernhard*, 396 U.S. 531, 542, 90 S.Ct. 733, 740, 24 L.Ed.2d 729 (1970)); (2) an action claiming that a contract should be reformed was tried to the judge, *id.* at 130 (citing *Great Atlantic v. Liberty Mutual Insurance Co.*, 773 F.2d 976, 978 (8th Cir. 1985)); (3) an action claiming a right to specific performance of a contract was tried to a judge, *id.* § 2309, at 85 (citing *Turner v. Burlington Northern Railroad Co.*, 771 F.2d 341, 343 (8th Cir.1985)); and (4) an action

---

**7.** Until the "writ of assumpsit" was developed contracts as we know them were extremely hard to enforce because "damages for breach of informal contracts [not under seal] was not an available remedy except in local, merchants' and ecclesiastical courts." 1 Arthur L. Corbin *Corbin on Contracts*, § 1.18, at 50 (rev. ed. 1993). The essential allegation of "assumpsit" was a "promise" by the defendant (*super se assumpsit*) which was relied upon by the plaintiff to his injury. *Id.* at 51. Assumpsit actions were tried to a jury. *Id.* Contract law developed "mainly in cases in which assumpsit was used as the form of action." *Id.* The literal meaning of the latin term "assumpsit" is "he promised." *Id.* There were

different types of "assumpsit," but each required that relief be predicated upon "the breach of an express or implied promise." *Id.* A "breach of contract" action as we know it developed in a type of action called "special assumpsit." *Id.* § 1.18(c) at 54. Among the essential allegations of a "special assumpsit" were "breach" and "damages." *Id.* There were other common law actions which were contractual in nature, such as covenant (contract under seal). 1A C.J.S. *Actions* § 75, at 475 (1985). Each such action required a "breach of a duty arising by contract" whether the duty was express or implied. *Id.* § 85, at 486.

claiming the right to an accounting predicated upon a contract asserted by a person who held a beneficial, but not legal, interest in the contract property—such as a cestui que trust [8]—was tried to a judge. *Id.* § 2310, at 87 & n. 2, 90 & n. 9. *See also Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

## B. The Principles Applied

I next determine whether NPPD's non-mediation claims and BN's RCAF claim are claims for which NPPD has a right to a jury trial.

### 1. NPPD's Non-Mediation Claims

■ With regard to NPPD's non-mediation claims I find and conclude that NPPD has no right to a jury trial for the following reasons.

#### (a)

First, the non-mediation claims are premised upon the rights set forth in section 14 of the contract. Section 14B explicitly provides a process to *amend* the contract: "B. In consideration of paragraph A above, *the parties desire to provide a procedure for amending the Effective Rate,* not to exceed plus or minus 15% of the applicable Effective Rate, *and/or utilization of the ICC Mid–Quarter Index* pursuant to the following." Section 14D of the contract provides that if the parties cannot agree on the "amendment" then an action for declaratory relief to "resolve the questions" can be brought. It is therefore beyond dispute that what NPPD seeks with regard to its non-mediation claims is an "amendment" of the contract.

The recognition that the non-mediation claims seek to amend the contract conclusively rebuts the characterization that these claims are for breach of contract, and hence triable to a jury. Indeed until the "amendment" process is complete the contract specifically provides in section 14E that the status quo remains; that is: "During the pendency of said ... *court proceedings,* the parties shall continue to abide by all provi-

sions of this Agreement." (emphasis added).

Therefore, with regard to these non-mediation claims which seek amendment of the "Effective Rate" or "utilization of the index" there is no duty for BN to breach until *after* the judicial proceedings have been completed; that is, BN has no unilateral obligation to reduce the rate charged NPPD until and unless the contract is amended. Indeed even if BN loses the "amendment" litigation there is no duty to make any reimbursements to NPPD until "120 days *after* the date said new Effective Rate or adjustment to the ICC Mid–Quarter Index is determined ... by a *final judgment* of a court of competent jurisdiction." Succinctly put, these non-mediation claims are not *"breach* of contract" actions since BN had no duty to change the rate or the index at the time this case was commenced, and any duty to pay money cannot arise under the contract until *after* judgment has been entered.

Second, historically the courts, whether courts of law or equity, lacked the power to "amend" contracts. *See e.g., United States v. Ames,* 99 U.S. (9 Otto) 35, 46, 25 L.Ed. 295 (1878) ("Courts of equity ... have no power to make agreements or to alter those which have been understandingly made...."); 17A C.J.S. *Contracts* § 263(3) at 89–96 (1963) ("It is not within the province, function, duty, or power of the court to alter, revise, modify, extend, rewrite, or remake a contract ... or to make a new, or different, contract for the parties,.... The foregoing principle ... has been held, by various decisions, to be applicable ... to courts of equity, as well as courts of law.") (collecting older cases). Accordingly, since historically neither courts of law or equity recognized suits to amend contracts, there is no specific historical precedent upon which NPPD can predicate its jury trial claim.

Third, to the extent it is proper to analogize to other types of actions in an effort to determine whether the instant action is similar to those types of actions that historically were tried to juries, *Markman,* —— U.S. at ——, 116 S.Ct. at 1389, I have done so.

---

8. A "cestui que trust" is a person "who possesses the equitable right to property" where the "legal estate" is vested in another. Black's Law Dictionary 289 (rev. 4th ed. 1968).

When one compares this case to earlier forms of action it appears that this action is most like a suit for specific performance of a contract coupled with a suit for reformation of a contract.

 Definition of these types of action is helpful. An action for specific performance of a contract is an action which seeks to compel "[p]erformance of a contract in the specific form in which it was made, or according to the precise terms agreed upon." Black's Law Dictionary 1296. When one seeks to "reform" a contract what "is meant [is] that the court, after ascertaining the real and original intention of the parties to a deed or other instrument, (which intention they failed to sufficiently express, through some error, mistake of fact, or inadvertence,) will decree that the instrument be held and construed as if it fully and technically expressed that intention." *Id.* 1446.

With these concepts in mind one can now compare NPPD's non-mediation claims to these actions. Initially, NPPD sues to specifically compel BN to participate in the contract amendment process by compelling BN's defense of these legal proceedings. According to section 14 of the contract BN is specifically bound to participate in this suit by waiving jurisdictional objections.

Once having compelled BN to participate in the amendment process, NPPD then seeks to reform (amend) the contract by invoking the provisions of section 14B to conform the contract to the intentions of the parties which are stated in section 14A of the contract. Sections 14A and 14B of the contract specifically contemplated that the contract may require amendment (reformation); that is, "the parties recognize that unforeseen changes in circumstances in the future might cause the Effective Rate to no longer reflect the parties' intentions" and thus "the parties desire to provide a procedure for amending [reforming]" the contract.

It is therefore accurate to categorize NPPD's non-mediation claims as being similar (if not identical) to actions for specific performance and reformation.

Fourth, having categorized NPPD's non-mediation claims as similar to claims for specific performance of a contract and for reformation of a contract, it is next appropriate to recognize that suits for specific performance, *Turner v. Burlington Northern Railroad Co.*, 771 F.2d at 343, and suits for reformation, *Great Atlantic Ins. Co. v. Liberty Mutual Ins. Co.*, 773 F.2d at 978, were historically tried to judges not juries. Thus, NPPD finds no support for its jury trial demand in historical analogies.

 Fifth, what is at issue in every aspect of NPPD's non-mediation claims is a construction of various provisions of a very complex contract that explicitly calls for the unusual remedy of judicial amendment of the contract. The construction function, involving as it does the "plenary interpretation of written instruments ... implicating the meaning of documentary terms," was not entrusted to juries when the Seventh Amendment was adopted. *Markman,* —— U.S. at ——————, 116 S.Ct. at 1391–1392.

As the Supreme Court has unanimously stated, "we ... know that ... during this period judges, not juries, ordinarily construed written documents." *Id.,* at ——, 116 S.Ct. at 1392. In fact "it was generally the practice of judges in the late 18th century 'to keep the construction of writings *out of the jury's hands* and reserve it for themselves,' a 'safeguard' designed to prevent a jury from 'constru[ing] or refin[ing] it at pleasure.'" *Id.,* at —— n. 7, at 1392 n. 7 (citing 9 J. Wigmore, *Evidence* § 2461, p. 194 (J. Chadbourn rev. ed. 1981) (emphasis in *Wigmore*) (internal quotation marks omitted)).

That resolution of the non-mediation claims will hinge at every step upon a "plenary interpretation" of the contract in order to ascertain "the meaning of documentary terms," *Markman,* at ——, 116 S.Ct. at 1392, is now apparent to me after more than six days of hearings. Specifically, a judge's determination of what the term "reasonable cost to Utility" means will effectively resolve NPPD's non-mediation claims because a definition of the term will at once define the term and for all practical purposes determine whether and to what extent NPPD prevails.

Moreover, this effort will require not only a construction[9] of the term "reasonable cost to Utility" but also the construction of the whole of the contract. For example, construction of "reasonable cost to Utility" will likely include construction of terms such as the "Base Rate," the "Effective Rate" (which will involve the construction of a formula set forth in the contract), "BN's operating costs and costs of capital," "reasonable profit, assuming honest and efficient management," "BN's costs directly related to the services provided by BN," "shall neutralize the effects of inflation," and other terms which have no plain meaning save for the meaning that judicial construction provides.

As *Markman* makes clear, this type of "plenary interpretation of written instruments" was simply not given to juries at the time the Seventh Amendment was adopted, and for good reason. *Id.* Juries lacked the training to properly supply "the meaning of documentary terms." *Id.* Even a cursory review of the interpretative principles which govern cases like this makes clear why juries in 1791 (and today) lacked the training. *See e.g., Restatement (Second) of Contracts,* §§ 200–204 (principles governing interpretation where the making of a contract is not in dispute).

In conclusion, as Justice Souter has observed, the interpretative function is better left to judges because the "construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis [interpretation]." *Markman,* at ——, 116 S.Ct. at 1395. Consequently, it is not necessary (or proper) for "the jury [to] shoulder [the] responsibility" of construction of the contract in this case in order to "preserve the 'substance of the common-law right of trial by jury.'" *Id.,* at ——, at 1390 (citing *Tull,* 481 U.S. at 426, 107 S.Ct. at 1840) (in turn quoting *Colgrove v. Battin,* 413 U.S. 149, 156, 93 S.Ct. 2448, 2452, 37 L.Ed.2d 522 (1973)).

**(b)**

NPPD's request for a judicial declaration of entitlement to "reimbursement" with regard to its non-mediation claims does not create a right to a jury trial. As earlier observed, the presence of a request for money as a form of relief does not dictate that a jury must be used. *Tull v. United States,* 481 U.S. at 425–27, 107 S.Ct. at 1839–41; *Bowen v. Massachusetts,* 487 U.S. at 893, 108 S.Ct. at 2731.

█ This is particularly true where, as here, "highly discretionary calculations that take into account multiple factors" (such as the "plenary interpretation" of terms like "reasonable cost to utility") "are necessary in order to set" any declaration of the reimbursement allegedly due once the contract is amended. *Tull,* 481 U.S. at 427, 107 S.Ct. at 1840. Indeed if the setting of the amount of penalties under the Clean Water Act did not require a jury in *Tull,* it is no stretch to conclude that the setting (amendment) of a coal transportation rate between a railroad and a public utility, and the related calculation of the amount of overcharge, does not require a jury, particularly when one remembers that these types of decisions had in the past been made by the Interstate Commerce Commission without a jury. *See e.g., Iowa Power & Light Co. v. Burlington Northern, Inc.,* 647 F.2d 796, 807–10 & n. 18 (8th Cir.1981) (discussing the ICC's authority to set rates for the transportation of coal to a coal-fired generating plant and acknowledging that prior to 1978 the power of shippers and railroads to set rates by contract had not been approved by the ICC).

Moreover, persuasive historical support for rejection of NPPD's jury trial argument is found in the fact that this court cannot enter a judgment for money against BN even if the court amends the contract as proposed by NPPD. This restriction in turn establishes that NPPD's claim—for a judicial declaration that it is entitled to reimbursement from BN—is purely equitable in origin.

---

**9.** In this sense I use "construction" interchangeably with "interpretation" as the *Markman* opinion does. Modern contract law makes distinctions between the two terms. *Restatement (Second) of Contracts,* § 200 & reporter's note at 82 (1981). Because the jury trial test is primarily historical in nature, these modern distinctions are not informative regarding the Seventh Amendment issue.

As noted earlier, section 14 of the contract provides that even if BN loses the "amendment" litigation there is no duty to make any reimbursements to NPPD until "120 days *after* the date said new Effective Rate or adjustment to the ICC Mid–Quarter Index is determined ... by a *final judgment* of a court of competent jurisdiction." BN has no duty to pay, or contractual provision to breach regarding payment, until *after* this litigation is concluded.

As a result of section 14 of the contract NPPD has no "legal" claim to a judgment for money in this suit because at most NPPD is only entitled to a declaration that BN owes NPPD money at some time in the future (after judgment) because of the amendment to the contract. Hence the only relief that NPPD can seek is equitable in nature. *See Dairy Queen*, 369 U.S. at 478, 82 S.Ct. at 900 ("The necessary prerequisite to the right to maintain an equitable accounting, like all other equitable remedies, is ... the absence of an adequate remedy at law."); *see also* 1A C.J.S. *Accounting* § 19, at 17–18 (1985) ("[A] court of equity will assume jurisdiction of an accounting where there is no remedy at law or the legal remedy is for some reason difficult, inadequate, and incomplete.... Conversely, equity will not take jurisdiction where there is an adequate and complete remedy at law, as where the account involved is based on a claim which, in effect, is merely for damages for breach of contract....")

Properly viewed then, NPPD's assertion of a claim for reimbursement is in reality "a bill for an accounting in equity." 9 Wright & Miller, *Federal Practice and Procedure* § 2310, at 87 & nn. 1–2. In other words, NPPD—the alleged "cestui que trust"—seeks to impose a trust upon BN, pursuant to the contract, with regard to the "overcharge" that BN may be required to pay NPPD *after* the judgment is entered assuming the contract is amended. The assertion of this type of trust claim is the essence of "a bill for an equitable accounting." 9 Wright & Miller, *Federal Practice and Procedure* § 2310, at 87 & n. 2, 90 & n. 9.

Therefore, as Professors Wright and Miller have observed, "a jury is not a matter of right" because in this case "the duty to account itself is of equitable origin." *Id.* at 90. *See also* 1A C.J.S. *Accounting* § 15, at 13 ("An accounting is essentially an equitable remedy.")

## 2. BN's RCAF Claim

█ Having discussed similar issues in terms of NPPD's non-mediation claims, only an abbreviated discussion of BN's RCAF claim and NPPD's alleged entitlement to a jury is necessary. I find and conclude that NPPD has no right to a jury trial for the following reasons.

First, BN's RCAF claim is that it is entitled to a determination that the RCAF(U), rather than the RCAF(A), is properly used pursuant to section 3B and section 14B of the contract, and, if the RCAF(U) is to be used, that the court should declare the Effective Rate as of the date of judgment. Categorically BN's claim is a request for specific performance of the contract, and, alternatively, for reformation in the event the parties were mistaken when they used the term RCAF in the third amendment without specifying in words RCAF(U) or RCAF(A).

Furthermore, the portion of the RCAF claim which asks the court to set the effective rate, using the RCAF(U), as of the date of judgment does not request monetary relief. Hence NPPD is not confronted with the possibility of a money judgment if it loses. Still further, the setting of the effective rate is prospective (from the date of judgment) only.

Second, as noted earlier, claims for specific performance or reformation were historically tried to judges and not juries. Thus NPPD has no historical precedent upon which to base its jury trial right.

Third, as again noted earlier, the construction of the contract, particularly the term "RCAF," was a judge's function at the time of the Founding, and hence there is no need to use a jury in order to preserve the constitutional right to trial by jury. And, as with the case of the non-mediation claims, a judge's construction of the term "RCAF" will effectively resolve BN's claim because a definition of the term will at once define the term and determine practically whether and to what extent BN prevails.

Finally, I reject NPPD's argument that by the assertion of affirmative defenses, some of which might have been historically categorized as "legal," it has created a right to a jury trial even though the affirmative defenses assert no claim for relief and the claim asserted against NPPD is equitable. Simply put, the Seventh Amendment has always been understood to protect claims, and not defenses which assert no claim for relief. *Owens–Illinois, Inc. v. Lake Shore Land Co., Inc.,* 610 F.2d at 1190. Since NPPD asserts no claim for relief, and BN's claim is entirely equitable, NPPD's defense creates no jury trial right.

In sum, as Judge Weis observed in the similar *Owens–Illinois* case:

> If there are no legal claims in a suit, there are no legal issues for purposes of determining the right to a jury trial.
>
> ... The defendant did not ask for affirmative relief but merely took the position that the plaintiff was not entitled to specific performance. That defense does not constitute a claim in either a legal or equitable sense. We therefore conclude there was no error in the district court's determination that the defendant was not entitled to a jury trial.

*Id.; see also Kennedy v. Rubin,* 254 F.Supp. 190, 195 (N.D.Ill.1966) (same).

### III. SUMMARY

A recapitulation is helpful.

With regard to NPPD's non-mediation claims I find that NPPD is not entitled to a jury trial for six reasons, and those reasons are:

(1) categorically the non-mediation claims seek an amendment of the contract, rather than a finding of liability for breach of contract and an award of damages;

(2) historically courts of law and courts of equity lacked the power to amend contracts;

(3) the best historical analogies to the non-mediation claims are actions for specific performance and reformation;

(4) historically there was no right to a jury trial in actions for specific performance and reformation;

(5) since resolution of the non-mediation claims hinge entirely upon a judge's "plenary interpretation of [a] written instrument" to ascertain "the meaning of documentary terms" it is not necessary for "the jury [to] shoulder this responsibility" in order to "preserve the 'substance of the common-law right of trial by jury' "; and,

(6) the portion of the non-mediation claims seeking "reimbursement" is equitable in origin, and therefore NPPD has no jury trial right on its non-mediation claims merely because it has asked for "reimbursement."

With regard to BN's "RCAF" claim I find and conclude that NPPD is not entitled to a jury trial for four reasons, and those four reasons are:

(1) categorically the RCAF claim seeks either specific performance of the contract or reformation of the contract and a prospective declaration of the Effective Rate which declaration will not impose a judgment for money on NPPD;

(2) the RCAF claim involving as it does a request for specific performance or reformation is an equitable claim that was historically tried to a judge rather than a jury;

(3) since resolution of the RCAF claim turns entirely upon a judge's construction of the contract, particularly the term "RCAF," the use of a jury is not necessary to preserve the substance of the common law right to juries; and,

(4) NPPD's assertion of various defenses to BN's equitable claim, without a claim by NPPD for affirmative relief, does not entitle NPPD to a jury trial even if some of the defenses are "legal" because the Seventh Amendment jury trial right attaches to claims not defenses.

Accordingly,

IT IS ORDERED that NPPD's "non-mediation claims" and the BN "RCAF" claim shall be tried entirely to the court without a jury, and NPPD's jury demand is stricken regarding those claims.